EARLE R. HORTON *vs.* TOWN OF NORTH ATTLEBOROUGH.

Bristol.    May 5, 1938. — January 10, 1939.

Present: LUMMUS, QUA, DOLAN, & COX, JJ.

*Sale,* Warranty, Of water. *Negligence,* In supplying water. *Municipal Corporations,* Waterworks. *Contract,* For the supplying of water. *Law of the Trial. Practice, Civil,* Exceptions: construction of bill.

An instruction to the jury to which neither party objected became the law of the trial in the light of which the questions brought to this court by exceptions must be considered.

Assuming that title to water supplied by a town to a householder passed at the "gate" at the street line and that there was some implied warranty of its fitness at that time under G. L. (Ter. Ed.) c. 106, § 17 (1), such warranty was that the water would be "reasonably fit" to be drunk in the house after passing thereto from the street line through the householder's lead service pipe, the use of which the town's representatives had approved, not merely that the water would be "reasonably fit" to be drunk at the time it passed the "gate."

In an action for negligence against a town by a householder who contracted lead poisoning from drinking water supplied to him by the defendant, with evidence that the amount of carbon dioxide in the water, and consequently its "plumbo-solvency," were so great as to make it dangerous for human consumption after passing through the plaintiff's lead service pipe, the use of which the town's representatives had approved, the jury should have been instructed that the defendant owed the plaintiff a duty to use reasonable care to see to it that the water would be wholesome for drinking, not only at the street line, but at the plaintiff's house after passing through his service pipe.

CONTRACT OR TORT.  Writ in the Superior Court dated October 15, 1934.

At the trial before *Goldberg, J.,* there was a verdict for the defendant on each count.  The plaintiff alleged exceptions.

*A. E. Whittemore,* (*L. McClennen* with him,) for the plaintiff.

*E. M. Dangel,* (*W. A. Swift, P. J. Armstrong,* & *G. A. Goldstein* with him,) for the defendant.

LUMMUS, J.  This case relates to the plumbo-solvency of water, that is, the capacity of carbon dioxide, found to some extent in all natural water, to dissolve lead while water stands in or passes through lead pipe, and thus to render the water poisonous.  Three tenths of a part in a million, or three parts in ten millions, is adopted by the United States Department of Health as the maximum amount of lead which may safely be in drinking water. Four parts of lead in a million make drinking water positively dangerous.  There was evidence that thirty parts of carbon dioxide in a million make it dangerous to conduct water through lead pipes, and twenty parts of carbon dioxide in a million constitute the limit of safety.

The defendant is engaged in the business of supplying water to householders, including the plaintiff, and to others, for a consideration.  It has the same responsibilities in contract and tort with respect to that business as any private person or corporation engaged in the same business. *Pearl* v. *Revere,* 219 Mass. 604.  *Bolster* v. *Lawrence,* 225 Mass. 387, 390.  *Lyons* v. *Lowell,* 239 Mass. 310.  *Sloper* v. *Quincy,* 301 Mass. 20.  *Oakes Manuf. Co.* v. *New York,* 206 N. Y. 221, 228.

In August, 1933, the plaintiff applied to the defendant for a supply of water at his house.  The regulations of the defendant permitted lead pipe to be used from the property line at the sidewalk to the meter inside the house.  The regulations provided that that pipe, called the service pipe, must be completely installed before being connected with the supply pipe at the property line, that the service pipe must not be covered over with earth until inspected by the water department of the defendant, and that the work

on the service pipe must be done under the direction and with the approval of the superintendent of the waterworks of the defendant.

The plaintiff employed a licensed plumber, who as an independent contractor installed a three-quarter inch lead service pipe from the property line to the meter, a distance of one hundred forty-five feet. A foreman of the defendant's water board, pursuant to the regulations and acting under general instructions from the board, duly inspected the service pipe as it lay open in the trench, knew that it was lead, and approved the installation. The defendant installed twenty-seven feet of similar pipe from its main in the street to the property line and made the connection at that place between the two pipes, at what is called the water gate, where apparently there is a shut-off. The plaintiff's water supply thus flowed from the main to the meter through one hundred seventy-two feet of lead pipe. Only one of the twenty-four hundred residences supplied with water by the defendant has a longer flow through lead pipe. Apart from the plaintiff's house and one other, the greatest length of such flow is one hundred feet. But a flow of as much as twenty-seven feet from the main to the property line is common among the defendant's customers. Lead pipe is almost universally used for the pipes from the main to the water gate and beyond that to the meter in the cases of all the defendant's residential consumers. On September 19, 1933, the defendant began to supply water to the plaintiff.

From that time the plaintiff's health, which had been good, began to decline. On July 20, 1934, his trouble was diagnosed as lead poisoning. The evidence warranted a finding that it was caused by drinking water supplied by the defendant at the plaintiff's house. Samples of water that had stood in the pipes for three hours contained four parts of lead in a million. Samples of water that merely flowed through the pipes contained from one and one half parts to two and one quarter parts of lead in a million. A sample of water that had stood in the pipes over night showed more than eight parts of lead in a million. Each sample showed thirty parts in a million of carbon dioxide.

The defendant had never received any complaint, prior to July 20, 1934, of carbon dioxide or lead in its water. The water was of normal color and taste, and displayed no abnormality upon ordinary observation. Analysis of the water supplied to various other consumers showed no excessive amount of lead. No member of the defendant's water board knew, before July 20, 1934, that the water supply contained carbon dioxide or lead or that carbon dioxide in any quantity made water dangerous for drinking if conveyed through lead. But the State department of public health in 1900 had published in its report a description of an epidemic of lead poisoning in several towns in the Commonwealth caused by carbon dioxide in water, and standard textbooks published between 1920 and 1933 recognized the danger.

The plaintiff on October 15, 1934, brought this action of contract or tort. The first count declares upon a warranty that the water supplied would be such as would be fit for drinking after passing through the lead pipes used by the plaintiff. The second count is for negligence. At the trial the jury returned a verdict for the defendant on each count. The case comes here on exceptions of the plaintiff to certain instructions and refusals to instruct.

On the first count for breach of warranty, the judge instructed the jury that the water was sold and delivered by the defendant at the water gate at the property line; that if the water at that point was fit for human consumption the defendant would not be liable though after passing that point it might become unfit; and that if the water was unfit at that point the defendant would be liable on its warranty of fitness only for injury caused to the plaintiff by the lead that was in the water at that point. To each of these propositions of law the plaintiff excepted. The plaintiff excepted to the refusal to give the following instructions: "1. The defendant in supplying water for domestic uses impliedly warranted that it was fit therefor when consumed through pipes of a kind approved by the defendant's authorized representative. 2. When the defendant required that water which it sold for drinking purposes be

conducted through pipe of iron, tin or lead, it expressed to the plaintiff its approval of lead pipe."

The judge, without objection or exception from either party, charged in substance in the instructions already stated that the defendant was bound by an implied warranty under the sales act, G. L. (Ter. Ed.) c. 106, § 17 (1) of which reads as follows: "Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose." It could readily be found, if not ruled on the undisputed facts, that the plaintiff made known to the defendant that the water was to be used for purposes which included drinking, and that the plaintiff relied on the defendant's skill to furnish him pure water. But the weight of authority is to the effect that that provision of the sales act does not apply to the furnishing of a supply of water through pipes. *Canavan* v. *Mechanicville*, 229 N. Y. 473. *Green* v. *Ashland Water Co.* 101 Wis. 258. *Pennsylvania Railroad* v. *Lincoln Trust Co.* 91 Ind. App. 28, 35. *Hayes* v. *Torrington Water Co.* 88 Conn. 609, 612.

We do not decide the question. The basic ruling of the judge, made without objection or exception, that there was an implied warranty under the sales act, became the law of the trial, and the instructions and requested instructions brought here on exceptions are to be considered upon the assumption that that basic ruling was correct. *Tompkins* v. *Quaker Oats Co.* 239 Mass. 147, 150. *Noble* v. *American Express Co.* 234 Mass. 536, 539. *Murphy* v. *Hanright,* 238 Mass. 200, 203–204. *Morel* v. *New York, New Haven & Hartford Railroad,* 238 Mass. 392, 393–394. *Glines* v. *Berry Box & Package Co. Inc.* 248 Mass. 518, 520. *Franca* v. *Rubin,* 268 Mass. 590, 593. *Minsk* v. *Pitaro,* 284 Mass. 109, 113. Since the existence of an implied warranty was not clearly questioned nor fully argued upon these exceptions, we do not consider disposing of the case on the doctrine of *Rathgeber* v. *Kelley,* 299 Mass. 444, and cases cited.

It may be assumed that the warranty is of fitness at the time when title to the water passed to the plaintiff, and not at any later time; and it may further be assumed in favor of the defendant, without deciding, that title passed at the water gate and not at the meter. See *G. E. Lothrop Theatres Co.* v. *Edison Electric Illuminating Co. of Boston,* 290 Mass. 189; *Fisher* v. *St. Joseph Water Co.* 151 Mo. App. 530, 534; *Pennsylvania Railroad* v. *Lincoln Trust Co.* 91 Ind. App. 28, 35.

But those assumptions are not decisive of the case on the first count. The "purpose" for which the defendant warranted the water to be "reasonably fit" was not merely drinking. The water was not to be drunk at the water gate nor at the meter. The "purpose" for which the water was "required" and for which it was to be "reasonably fit" included the passage of the water through one hundred forty-five feet of lead pipe, known to and approved by the defendant, before the water could get into the house or be drunk. The defendant no doubt might assume that the water, once inside the house and subject completely to the control of the plaintiff, would be conducted and used in a normal and proper manner, and the defendant would be under no duty to inspect or investigate inside the house. *Brunelle* v. *Lowell Electric Light Corp.* 188 Mass. 493. *Minneapolis General Electric Co.* v. *Cronon,* 166 Fed. 651. *Memphis Consolidated Gas & Electric Co.* v. *Speers,* 113 Tenn. 83. See also *Jackson* v. *Ellendale,* 4 N. D. 478. But it is not suggested that anything in the water system inside the house had any causal relation to the injury. If there is a warranty under the circumstances of this case, as the trial judge ruled, it is a warranty that when the water becomes the property of the plaintiff it will be reasonably fit to be conducted through one hundred forty-five feet of lead pipe into the house and then to be drunk.

Comparable situations exist in implied warranties of fitness of ordinary merchandise. For example, in *Beer* v. *Walker,* 46 L. J. C. P. (N. S.) 677, a wholesale dealer was sued for breach of warranty of rabbits, which when shipped from London were fit to be eaten but not to withstand the

railway journey to Brighton, where, as the wholesale dealer knew, the buyer intended to sell them as food. The wholesale dealer was held liable on his implied warranty of fitness. See also *Leopold* v. *Van Kirk*, 27 Wis. 152. A seller of meat to a householder does not warrant that it is fit to be eaten raw, but warrants only that it is fit to be eaten after the ordinary domestic cooking that is to be expected. *Holt* v. *Mann*, 294 Mass. 21, 24. *Cheli* v. *Cudahy Brothers Co.* 267 Mich. 690. *Feinstein* v. *Daniel Reeves, Inc.* 14 Fed. Sup. 167. *Zorger* v. *Hillman's*, 287 Ill. App. 357. Compare *McSpedon* v. *Kunz*, 271 N. Y. 131. The plaintiff's exceptions as to the first count must be sustained, for the instructions were contrary to the principles which we have stated.

On the second count for negligence, the judge instructed the jury in substance that to recover the plaintiff must show that the water delivered at the water gate was then and there unfit for human consumption, and that its unfitness was due to negligence of the defendant. To the first branch of that instruction the plaintiff excepted. Subject to the exception of the plaintiff, the judge told the jury that if they should find for the plaintiff they could assess damages only for the injury resulting from lead which was in the water at the water gate. Subject to the exception of the plaintiff, the judge refused to give the following instruction requested by the plaintiff: "A town proffering to sell water for domestic consumption is under a duty to take such reasonable steps in the then state of common knowledge of those versed in the subject as may reasonably be expected to disclose whether the water is adapted for such use when transmitted through the kind of pipes which the town expects will be used."

The defendant, in entering upon the business of supplying water, assumed the duty towards its customers of conducting the business "with reasonable judgment, skill and care, according to the approved usages of . . . [the] trade" (*Kelley* v. *Laraway*, 223 Mass. 182, 184), and of using "the ordinary care of the man of common prudence . . . in view of the facts accessible to and likely to be considered

and acted upon by a reasonable person before the event complained of." *Hecht* v. *Boston Wharf Co.* 220 Mass. 397, 403. Specifically, with regard to the purity of water supplied for drinking, the defendant owed the duty of furnishing at all times a supply of wholesome water, so far as that could be done by the exercise of care, diligence and skill which is ordinary and reasonable in view of the nature of the business. *Hamilton* v. *Madison Water Co.* 116 Maine, 157, 165–166. *Hayes* v. *Torrington Water Co.* 88 Conn. 609, 612. *Boguski* v. *Winooski,* 108 Vt. 380, 389. *Jones* v. *Mount Holly Water Co.* 87 N. J. L. 106, 109–110. *Roscoe* v. *Everett,* 136 Wash. 295. *Aronson* v. *Everett,* 136 Wash. 312. *Safransky* v. *Helena,* 98 Mont. 456, 473. *Pennsylvania Railroad* v. *Lincoln Trust Co.* 91 Ind. App. 28.

The trial judge, by submitting the case to the jury, impliedly ruled that there was evidence warranting a verdict for the plaintiff on the second count as well as on the first count. We accept that ruling as the law of the trial for the purpose of dealing with the exceptions to his instructions and refusals to instruct. He was in error, we think, in instructing the jury in substance that the responsibility of the defendant for the quality of its water stops at the water gate. The instruction requested was substantially correct in law, and ought to have been given in effect if not in terms. The defendant was bound to take into consideration the fact that the water could not be drunk at the water gate, and to adapt its care to the fact that its water had to pass through a leaden service pipe in to the house before it would be or could be used for drinking. In *Barnes* v. *Irwell Valley Water Board,* 54 T. L. R. 815, 820, Slesser, L. J., said, "The board have . . . offered to supply the consumer with water pure and wholesome in such conditions that are known to both parties to obtain — namely, to supply it so that it will have to travel through lead service pipes, that being a common method agreed on by both parties for the supply of water, and indeed contemplated by the regulations, and the board cannot be heard to say that, because the consumer has chosen to have his water supply through a lead pipe rather than through an iron pipe, the fault is his

and not the fault of the water board. . . . There was an obligation in that case to supply him with water which, coming through a lead pipe, would not be water which would be poisonous." The plaintiff's exceptions relating to the second count must also be sustained.

*Exceptions sustained.*