GERTRUDE TAYLOR *vs*. BERNARD JACOBSON.

Suffolk. November 8, 1957. — February 5, 1958.

Present: WILKINS, C.J., RONAN, SPALDING, WILLIAMS, COUNIHAN, WHITTEMORE, & CUTTER, JJ.

*Sale*, Warranty, Of hair dye. *Evidence*, Evidence binding a party.

A finding that the proprietor of a drug store expressly or impliedly warranted to a purchaser of a hair dye its fitness for a particular purpose was not permissible where it appeared that the purchaser asked for "Roux 104," which was out of stock, and the proprietor told her "he had 105 . . . [with] the same ingredients, only . . . the shade was a little bit darker," and that she bought Roux 105. [713]

In an action by a purchaser of hair dye for breach of warranty of merchantability, testimony by the plaintiff that she read and understood the manufacturer's instructions enclosed in the package of hair dye was binding on her. [716]

The implied warranty of merchantability made by the proprietor of a retail drug store under G. L. (Ter. Ed.) c. 106, § 17 (2), in selling a package of bottled "Roux" hair dye was limited to warranting its reasonable suitability for the ordinary use of such a dye when used in accordance with reasonable, intelligible and adequate manufacturer's warnings and instructions enclosed in the package and read and understood by the purchaser. [716]

Certain manufacturer's directions packaged with bottled hair dye sold by the proprietor of a retail drug store, warning that "a limited few" people might be allergic to the dye and that a "patch test," described in detail, should be made "before every application," were adequate to limit the proprietor's implied warranty of merchantability under G. L. (Ter. Ed.) c. 106, § 17 (2), to warranting the suitability of the dye for the ordinary use of such a dye when used in accordance with the directions. [716–717]

A purchaser of a package of bottled hair dye at a retail drug store, who read and understood adequate manufacturer's instructions in the package warning that the dye was harmful to "a limited few" and that a described "patch test" should be made "before every application," but who, because she had long used that make of dye without trouble,

did not make the test before using the dye after such purchase and suffered severe physical injury through such use, had no cause of action against the proprietor of the drug store for breach of the implied warranty of merchantability under G. L. (Ter. Ed.) c. 106, § 17 (2). [718]

CONTRACT OR TORT. Writ in the Superior Court dated December 10, 1951.

The action was tried before *Swift*, J.

In this court the case was argued before *Wilkins*, C.J., *Ronan, Counihan, Whittemore,* & *Cutter*, JJ., and afterwards was submitted on briefs to all the Justices.

*Philander S. Ratzkoff*, for the defendant.

*Morris Michelson, (Marvin K. Rasnick* with him,) for the plaintiff.

CUTTER, J. This action (contract or tort) was originally brought against the defendant Jacobson (hereinafter called Jacobson) and Roux Laboratories, Inc. (hereinafter called Roux), to recover damages for a severe skin infection alleged to have been caused to the plaintiff by the use of hair dye made by Roux, which the plaintiff purchased from Jacobson in April, 1949. The action was dismissed as against Roux after hearing on an answer in abatement. Jacobson's bill of exceptions presents only an exception to the trial judge's denial of Jacobson's motion for a directed verdict. There was a verdict for the plaintiff. The facts are stated in their aspect most favorable to the plaintiff.

Jacobson conducted a drug store in Revere. "[I]ncluded in the merchandise offered for sale . . . was a product known as Roux oil shampoo tint . . . a preparation for use on human hair." The plaintiff went to Jacobson's store and asked "for a package of Roux 104." That number was out of stock, but the druggist had 105, which was "a little bit darker" shade. She bought Roux 105. She then went to the house of a Mrs. Kelly, who some years before had "worked with a hairdresser, " but was not herself a licensed hairdresser, to have the Roux dye applied. They "opened . . . the package . . . and read the directions." The plaintiff "read the instructions both on the cover and in the booklet" including the "portion on. the cover of the

Roux entitled 'caution' just before she used the dye. . . . [S]he and Mrs. Kelly read the whole instruction book carefully . . . [and] there was nothing confusing about it."

The package in which the bottles of hair dye were enclosed and the label on the bottles contained identical warning notices reading, "CAUTION This product contains ingredients which may cause skin irritation on certain individuals and a preliminary test according to accompanying directions should first be made. This product must not be used for dyeing the eyelashes or eyebrows; to do so may cause blindness." On page 2 of the accompanying small booklet (three and three quarters inches high by two and one half inches wide) of instructions appeared printed in small type: "THE PRELIMINARY OR PATCH TEST Medical science has established the fact that a susceptible person may be allergic to even the simplest product. Of the millions of persons using or contemplating the use of hair colorings, a limited few may be allergic or hypersensitive to them. The common method used by medical authorities in detecting those hypersensitive persons is by a preliminary or patch test. Therefore, before contacting or using this product, a test, in strict accordance with the following directions, should be made." Immediately thereafter appears, "The Patch Test In order to ascertain whether you are hypersensitive to this product, the following test should be made before every application." The procedure to be used in the patch test was then described in detail on pages 2, 3, and 4 of the pamphlet.[1]

Mrs. Kelly applied the dye with a new toothbrush and, in the course of that night, the plaintiff's head began "to burn." She consulted a doctor. The condition became worse and she was hospitalized with "sores through the

[1] The final paragraph describing this procedure was: "5 . . . examine the test area within the next 24 hours [after applying a test solution to a small area of scalp or skin]. If found negative, the application of the tint must then be made immediately.

"If any burning, itching, swelling, irritation, eruption or abnormal reaction is experienced in or around the test area at any time during the test period then you are hypersensitive to this preparation and MUST NOT use this product. Roux . . . Tint (Concentrate) should not be applied to the hair where the scalp or adjacent area shows evidence of any abrasion, eruption or other abnormal or diseased condition."

scalp, face and down her body . . . her eyes were swollen badly." She was "blown up like a balloon, her eyes were slits, and her ears were big, she had sores all over her face and her neck and they were running." She was prevented from working "that summer" and "it took about a year for the redness to clear up."

When Mrs. Kelly finished applying the dye there was a small portion left. This "she put . . . on her back porch with the toothbrush; the next morning she noticed the toothbrush had practically been eaten away."

The plaintiff "had been using hair dye . . . for some twenty odd years; she always used Roux . . . every three, four or six months." Prior to April, 1949, when she last used Roux 104, she "had no trouble." She admitted that "there was no patch test performed just prior to this application in April [1949] . . . she did not do a patch test at the time before this . . . ; she had used Roux so many times she didn't need a patch test; she doesn't remember whether a patch test was done eight months previous to that."

There was medical testimony of "a causal relationship between the contact with the dye and the condition" of the plaintiff. It was agreed that the plaintiff gave seasonable notice to Jacobson of the alleged breach of warranty. See G. L. (Ter. Ed.) c. 106, § 38; *Mead* v. *Coca Cola Bottling Co.* 329 Mass. 440, 443–445.

1. Count 3 of the declaration, which states the cause of action against Jacobson, sets up a claim based upon (a) breach of express and implied warranties by him that the product "was fit for a particular purpose and . . . was of merchantable quality and . . . fit to be used upon her hair," and (b) the plaintiff's reliance on these "warranties" to her damage. There is no allegation or proof whatsoever of any negligence on the part of Jacobson.[2]

---

[2] Accordingly, cases involving negligence in the preparation or distribution of products for use on or in the human body (*Carter* v. *Yardley & Co. Ltd.* 319 Mass. 92, 94–104, and cases cited) or negligent failure to warn of dangerous qualities (see Massachusetts cases collected in Judge Waterman's exhaustive recent opinion in *Wright* v. *Carter Products, Inc.* 244 Fed. [2d] 53, 56–59 [C. A. 2], and note 37 B. U. L. Rev. 519, 520–522) are here not directly relevant.

2. Under the circumstances in which the hair dye was sold by its trade name, there was no implied warranty of the product's "fitness for any particular purpose." G. L. (Ter. Ed.) c. 106, § 17 (4).[3] *Dekofski* v. *Leite, ante,* 127, 129, and cases cited. Williston, Sales (Rev. ed.) § 236a. Harper and James, Law of Torts, § 28.20, at page 1582. Prosser, Torts (2d ed.) § 83. Here the plaintiff asked "for a package of Roux 104 which . . . she had always used and . . . [Jacobson] told her . . . that he had 105, which was the same ingredients, only that the shade was a little bit darker." There was no evidence that what he actually said was in any degree inaccurate, even if the plaintiff relied upon it. We think that this evidence was insufficient to warrant a finding either (a) that the plaintiff relied upon Jacobson to select the product for her or (b) that he expressly or impliedly warranted that it was fit for any particular purpose, in a manner beyond the scope of the implied warranty of merchantability next mentioned. Compare *Graham* v. *Jordan Marsh Co.* 319 Mass. 690, 692. A finding that this was not a sale by trade name could not properly have been made.

3. General Laws (Ter. Ed.) c. 106, § 17 (2), provides, "(2) Where the goods are bought by description from a seller who deals in goods of that description, whether he be the . . . manufacturer or not, there is an implied warranty that they shall be of merchantable quality." Purchase by trade name does not exclude liability under this subsection. *Mead* v. *Coca Cola Bottling Co.* 329 Mass. 440, 442, and cases cited. Williston, Sales (Rev. ed.) § 236a. See § 243.

The Roux hair dye here involved was "merchantable," in the sense in which the term is used in § 17 (2), if it was "reasonably suitable for the ordinary uses for which goods of that description are sold," here obviously for a hair dye (*McCabe* v. *Liggett Drug Co. Inc.* 330 Mass. 177, 179), and

---

[3] Section 17, in all respects here relevant, is the same as § 15 of the uniform sales act. Compare St. 1957, c. 765, § 1 (§ 2–315 of the Uniform Commercial Code, to become a new G. L. c. 106, effective under St. 1957, c. 765, § 21, on October 1, 1958), in which there is no language precisely like that in § 17 (4).

if the goods were reasonably standard and uniform for their brand and equivalent to other articles sold under the same name and description. See *F. W. Stock & Sons* v. *Snell,* 226 Mass. 499, 503. See also *Inter-State Grocer Co.* v. *George William Bentley Co.* 214 Mass. 227, 231; *Agoos Kid Co. Inc.* v. *Blumenthal Import Corp.* 282 Mass. 1, 6–10; *Botti* v. *Venice Grocery Co.* 309 Mass. 450, 454–457; Prosser, The Implied Warranty of Merchantable Quality, 27 Minn. L. Rev. 117, 141–143; Harper and James, Law of Torts, § 28.20; Note, 23 Tenn. L. Rev. 385, 400.[4]

The evidence that the dye was not of standard or merchantable quality is meager. It is not necessary, however, to determine whether it is sufficient to warrant a finding that the dye was not of standard quality or unsuitable for its intended use by one who had a normal skin, or whether it could be inferred that the plaintiff had such a skin. See *Payne* v. *R. H. White Co.* 314 Mass. 63, 65–66; *Graham* v. *Jordan Marsh Co.* 319 Mass. 690, 693; Note, 25 Fordham L. Rev. 306, 310–313. Compare *Longo* v. *Touraine Stores, Inc.* 319 Mass. 727. The present case depends upon the weight to be given to the instructions and warning to take a "patch test."

Jacobson argues that, because of the instructions, his implied warranty of merchantability means only that the dye "was reasonably fit to dye hair . . . when used in conformity with the accompanying instructions" and that compliance with the instructions by the buyer was an integral part of the warranty. He relies on *Holt* v. *Mann,* 294 Mass. 21, 24 (warranty as to food held to be "that it was fit to eat after ordinary domestic cooking"); *McCabe* v. *Liggett Drug Co. Inc.* 330 Mass. 177, 180 (whether a coffee machine was merchantable depended on its capability, when properly used in accordance with instructions); and *Mead* v. *Coca Cola Bottling Co.* 329 Mass. 440, 441. See *Bianchi* v. *Denholm & McKay Co.* 302 Mass. 469, 473–474 (where weight is given to the absence there of "evidence that the use of

---

[4] The Uniform Commercial Code (see note 3, *supra*), § 2–314, sets out in considerable detail the attributes of merchantability (see St. 1957 c. 765, § 1).

the face powder . . . was not precisely in the manner for which it was intended"). See also *Horton* v. *North Attleborough*, 302 Mass. 137, 142; *Ringstad* v. *I. Magnin & Co.* 39 Wash. (2d) 923, 933. Compare *Middleby-Marshall Oven Co.* v. *Wagoner*, 106 Ind. App. 278, 283; *Fredendall* v. *Abraham & Straus, Inc.* 279 N. Y. 146, 147–148; *Landers* v. *Safeway Stores, Inc.* 172 Ore. 116, 122–139.

If Jacobson, the retail vendor, did not adopt the directions and warnings given by Roux, the manufacturer, the directions and warnings have no tendency to limit or disclaim the implied warranty which Jacobson is held by law to have given. As a practical matter, when a retail druggist sells (without express warranties or representations of his own) one of the many thousand manufactured products in his stock in trade, which has been asked for by trade name, it is a necessary inference that he adopts as his own any cautionary statements, disclaimers and limitations of warranties made (on the package and in accompanying circulars) by the manufacturer who best knows the infirmities of his product.

In *Sokoloski* v. *Splann*, 311 Mass. 203, 208, to be sure, it was held, on the particular facts of that case, that a finding was not required that a wholesaler's statement on a seed package, denying the existence of warranties, had been adopted by a retail vendor of the seed. The *Sokoloski* case was one in which "field corn" was bought, not under a trade name but by that more general description, and this court stated (at page 207) that it could have been found on the evidence "that the corn delivered . . . was not 'field corn' of merchantable quality under that name," which, if it met that description, could be used as seed corn. The disclaimer by the wholesaler was a tag tied to the corn "Field Corn . . . [X Company] Give no warranty, express or implied, as to description, quality, productiveness or any other matter of any seeds . . . and . . . will not be . . . responsible for the crop." There was also evidence that the clerk selling the corn described it to the purchaser as "Good field corn" (page 205). We think that the present case is distinguishable.

. Here the plaintiff admits that she read and understood the instructions and did not comply with them. She is bound by this testimony. *Hannon* v. *Hayes-Bickford Lunch System, Inc., ante,* 268, 273. Doubtless, she knew about the warnings and instructions when she bought the hair dye, in view of her long prior use of the product, and their existence was a circumstance which should have been within her contemplation when the sale was made. See Williston, Sales (Rev. ed.) §§ 239–239c, especially at pages 628–631; Prosser, The Implied Warranty of Merchantable Quality, 27 Minn. L. Rev. 117, 136, 157–167; Harper and James, Law of Torts, § .28.25, at page 1589. We thus need not consider what would be the governing rule with respect to instructions not read, because in fine print or because otherwise not calculated to reach the buyer's attention.[5] We hold (on the authority of the cases relied on by Jacobson already cited) that a retailer's implied warranty of merchantability with respect to goods not of his manufacture is no wider than that they are reasonably suitable for the ordinary uses for which goods of that description are sold when used in accordance with reasonable, intelligible and adequate warnings and instructions known, or which should have been known, to the purchaser.

4. It remains for us to consider whether the instructions and warning were sufficiently clear. A majority of the court are of the opinion (a) that the instructions were sufficiently explicit and adequate to point out the necessity of a patch test, and (b) that the implied warranty was only that the dye was merchantable if it was used after the user had taken the prescribed patch test without any indication from the test that use of the dye would be harmful. This view is supported (1) by the words on the bottle that the "product contains ingredients which may cause skin irritation on certain individuals and a preliminary test according to accompanying directions should first be made"; (2) by the detailed instructions about how to make the patch test; (3) by

---

[5] Compare § 2–316 of the Uniform Commercial Code (St. 1957, c. 765, § 1; see footnote 3, *supra*).

the instructions that "before contracting or using this product, a test, in strict accordance with the following directions, should be made"; and (4) by the words in the patch test instructions that the "test should be made before every application." See also footnote 1, *supra.* The position gains support also from *Schilling* v. *Roux Distributing Co. Inc.* 240 Minn. 71, 88–89, 91, where the Minnesota court, considering the same product and instructions, permitted a purchaser, injured while "retouching" her hair, to recover because of the ambiguity of the instructions to users contemplating a "retouching" as opposed to a complete "application" of the dye, but said that "the instructions would imply that the test was required prior to an original application." See also *Holmes* v. *Ashford*, [1950] 2 All E. R. 76 (where, in an action of tort for negligence against the manufacturer of hair dye, instructions and warnings that "the dye . . . might be dangerous to certain skins and advising that a test should be made before use" were disregarded by a hairdresser who had read the instructions, with the result that recovery against the manufacturer was denied; but the court, at page 77, expressly did not pass upon the question whether the warning would have been sufficient "where the substance is used by a woman on her own hair"). The majority feel that the "limited few," mentioned below, were sufficiently warned by the express statements on the bottle and in the circular, which were read and understood by the plaintiff.

Mr. Justice Counihan and the writer of this opinion, on this phase of the case, wish to record their view that the instructions (1) could reasonably be regarded as a delicately phrased attempt to afford protection from claims by the "limited few [who] may be allergic or hypersensitive to" hair dyes, without scaring away as potential customers any substantial part of the "millions of persons using or contemplating the use of hair colorings" (see text of warnings, quoted *supra*), and (2) are not sufficiently explicit and emphatic as a disclaimer (compare *S. F. Bowser & Co. Inc.* v. *Independent Dye House, Inc.* 276 Mass. 289, 295–297;

*Dekofski* v. *Leite, ante,* 127, 129,) to direct consumers' attention to the real nature of the various serious dangers involved in disregarding instructions, including the special dangers of a gradually developing sensitivity or allergy in a customer who had used the product previously without injurious effect.

5. Since the plaintiff disregarded instructions, held here to be adequate, she has not shown that she was within the scope of any implied warranty given by Jacobson. The motion for a directed verdict for the defendant should have been granted.

<div align="right">

*Exceptions sustained.*
*Judgment for the defendant.*