OLIVE CASAGRANDE vs. F. W. WOOLWORTH CO., INC.

Middlesex.    February 2, 1960. — March 14, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, &
CUTTER, JJ.

Sale, Warranty, Of deodorant. Evidence, Presumptions and burden of
proof.

An implied warranty of merchantability by a retailer in a sale of a de-
odorant is that it is reasonably fit for use as such by a normal person.
[555]
In an action for breach of an implied warranty of merchantability in a
retail sale of a deodorant to one who suffered skin trouble from its
use, any presumption of normality of the plaintiff's skin disappeared
upon the introduction of evidence tending to show that the deodorant
and its components were not significant irritants.  [555–556]
A retail purchaser of a deodorant, who suffered skin trouble from its use,
could not recover from the seller for breach of an implied warranty of
merchantability where the plaintiff on the record was not aided by any
presumption of normality of her skin and failed to prove that use of the
deodorant would have harmed any significant number of persons or
that it was unfit for use by a normal person.  [556]

CONTRACT.    Writ in the District Court of Somerville
dated July 18, 1957.

Upon removal to the Superior Court the action was tried
before Cahill, J.   There was a verdict for the plaintiff.

Robert W. Cornell, for the defendant.

Alfred J. Medaglia, for the plaintiff.

WHITTEMORE, J.    The defendant excepted to the denial
of its motion for a directed verdict in this action for breach
of an implied warranty of merchantability in the sale, in
July, 1956, of a jar of a deodorant which bore the statement
"nonirritating to normal person."   The plaintiff asked for
deodorant and the salesgirl gave her the "Mum" which she
had bought many times before.

It could have been found that the use of the material in
the jar caused the plaintiff's dermatitis.   The plaintiff testi-

fied that irritation began in her armpits about an hour after application of the deodorant. The plaintiff also testified that she had applied the same deodorant once or twice daily for about twenty years, and had never experienced skin trouble of any nature, had never been ill except for childhood diseases, and was not troubled with emotional or mental problems at or prior to the affliction.

A qualified dermatologist, who had treated the plaintiff, testified that he assumed a deodorant was the cause of the condition "because . . . the rash started . . . where she had applied the deodorant"; continued use of the same product over a period of years may sensitize the skin; a "sensitizer" as distinguished from a "primary irritant" is a substance which does not irritate everyone, or anyone on first use, but which may eventually cause the user to develop antibodies and thereby become allergic to it and thereafter always react to its use. He testified also that none of the ingredients of the deodorant, as testified to by others, was a "primary irritant," that is, a substance which would cause "any patient using . . . [it to] break out in a rash"; "people react to almost anything, some people at some time will become sensitized to almost anything and have adverse reactions; that is the situation he feels he found in this plaintiff . . .; whether anyone else in the United States would have . . . the adverse effects . . . he can't tell." Another dermatologist testified that "[t]here is no limit to the number of articles . . . which can, after use, bring about a sensitivity."

The chemist in charge of quality control for the manufacturer named the ingredients of the deodorant and testified that the contents of the jar returned on behalf of the plaintiff had been analyzed, found to be made in accordance with the formula, and to contain "no foreign material of an irritating nature." In 1956, about sixteen million units of the deodorant were produced. In a year's time the manufacturer might get ten or twenty complaints relating to the contents of the packages. In 1948 the perfume was changed; in 1949 hexachlorophene was added; at one time the proportion of

zinc oxide was raised from two to five per cent. No change was made on account of any complaint.

A physician employed by the manufacturer testified that in 1956 his department was conducting, or having others conduct, clinical tests of the effectiveness and safety of the product and had been doing this work at least since 1946. Describing the ingredients, he testified that mineral oil is a fatty substance capable of absorbing odor and a common vehicle used in ointments, laxatives and baby oil. Zinc stearate is a mild antiseptic powder used in talcum and in treating skin irritation. Zinc oxide is in the same category, is used in calamine lotions and can absorb small amounts of moisture. Beeswax and paraffin give some firmness and are commonly used in ointments. Hexachlorophene is "one of the modern powerful antibacterial agents which at the same time had a record of safety. It is eminently safe for a large number of people and has amazing power of killing or slowing down the growth of bacteria on the skin. It has its broadest use in the surgical operating rooms . . . [and] is present in a wide variety of cosmetic products, including . . . [a trade marked] soap, and . . . at least one major brand of toothpaste." The cocoanut oil is "another fatty material." The perfume was added only to give a pleasant odor. In his opinion none of these ingredients alone or in combination had a direct irritating effect on the skin. The possibility that a number of people could be sensitive to one or more ingredients could not be expressed on a probability basis. From this company's research "he would think that not more than one person in two thousand would even show a sensitive reaction." In a patch test sampling of at least 400 people over a four or five week period there were no reactions during approximately 2,400 applications. "Of the people who conceivably might be adversely affected by one of the components, such as hexachlorophene, that person would similarly be affected by the use of . . . [the trade marked] soap or the same product in some other form. If a person was sensitive to zinc oxide, it would also show up if he put a bandaid on his hand." His department has re-

ceived various samples of the deodorant which had been claimed to have had an adverse effect on persons. These had been analyzed and he could recall no instance "where there was a defect in the product." A person who becomes sensitive or allergic is an exception to the general rule. A person free of worry, and of abnormalities, physical or mental, without idiosyncrasies and with body functioning perfectly, that is, a normal person, could in time become sensitive to a product.

It is not in controversy that there was a warranty of merchantability in this sale. *Taylor* v. *Jacobson*, 336 Mass. 709, 713. *Botti* v. *Venice Grocery Co.* 309 Mass. 450, 454–458. G. L. (Ter. Ed.) c. 106, § 17 (2) (see now G. L. c. 106, § 2–314). Compare *ibid.*, § 17 (4). A retailer's implied warranty of merchantability of goods not of his manufacture is that they are reasonably suitable for the ordinary uses for which goods of that description are sold when used in accordance with adequate warning and instructions. *Taylor* v. *Jacobson*, 336 Mass. 709, 716. Fitness for use by a normal person is a test often stated. *Jacquot* v. *Wm. Filene's Sons Co.* 337 Mass. 312, 315.

Had there been no evidence on the issue of the sensitivity of the plaintiff's skin, other than the irritation complained of, the plaintiff would have been aided by the "assumption that a human being is . . . normal." *Payne* v. *R. H. White Co.* 314 Mass. 63, 65–66. From this, and the harm done, it could have been inferred that the product was a sensitizer, unmerchantable if sold without a suitable warning.[1] We think that the rule in the *Payne* case, at least as applied in allergy cases, depends upon a presumption. It is a means of casting upon the defendant the burden of going forward with evidence. *Epstein* v. *Boston Housing Authy.* 317 Mass. 297, 302. As such it does not help this plaintiff. Any pre-

---

[1] For the importance of a warning adequate to alert the user if a sensitizer is present, see *Taylor* v. *Jacobson*, 336 Mass. 709, 716–718; *Wright* v. *Carter Prod. Inc.* 244 F. 2d 53, 56–60 (2d Cir.); Dillard and Hart, Product Liability: Directions for Use and the Duty to Warn, 41 Va. L. Rev. 145. For the protection afforded the retailer by the manufacturer's warning, see *Vincent* v. *Nicholas E. Tsiknas Co. Inc.* 337 Mass. 726, 728–729; *Taylor* v. *Jacobson, supra*, 715; 1958 Annual Survey of Mass. Law, 80–83.

sumption of normality disappeared in the light of the evidence which tended to show that the deodorant and its components were not significant irritants. *Jacquot* v. *Wm. Filene's Sons Co.* 337 Mass. 312, 316. Wigmore, Evidence (3d ed.) § 2491 (2).

In the absence of a presumption, the plaintiff, to sustain the burden of proof, must adduce evidence which, with reasonable inferences, warrants the conclusion that the product was unfit, that is, that it would have sensitized a significant number of persons (*Jacquot* v. *Wm. Filene's Sons Co.* 337 Mass. 312, 317; *Bianchi* v. *Denholm & McKay Co.* 302 Mass. 469, 471, 473) either immediately or after a period of use. There is no such proof in this case. *Longo* v. *Touraine Stores, Inc.* 319 Mass. 727. *Zampino* v. *Colgate-Palmolive Co.* 8 App. Div. (N. Y.) 2d 304. The testimony of the manufacturer's physician is not that one in two thousand users of the deodorant would show a sensitive reaction and we do not determine if such evidence would be proof of a significant sensitizer. The context shows that no implication was intended beyond the precise statement "not *more* than one person in two thousand" would show a reaction (emphasis supplied). Nothing against the product can be concluded from the evidence that in 1956 complaints were received from ten or twenty users. The evidence suggests the possibility that hexachlorophene is a known sensitizer in significant degree but it does not go beyond mere possibility.

The jury, of course, could have disregarded evidence unfavorable to the plaintiff, by which she was not bound. The general knowledge of allergies, however, of which we take notice, and which is reflected in the testimony, makes it unreasonable to infer from any part or parts of the evidence that a significant number of other persons would have been hurt by the deodorant. An inference of fact that the product would have hurt "normal" persons may not be drawn from the evidence of an allergic reaction in one person who has not previously shown sensitivity. *Longo* v. *Touraine Stores, Inc.* 319 Mass. 727.

We think a presumption of normality remained operative

in *Graham* v. *Jordan Marsh Co.* 319 Mass. 690. The testimony of the plaintiff's physician that her condition was "allergic dermatitis, some sensitivity to something that she came in contact with," did not warrant an inference that her skin was "unusually susceptible to cold cream" (pp. 692–693). There was no other evidence on the issue and therefore nothing to rebut the presumption, and it was rightly held error to direct a verdict for the defendant, although not on the ground that evidence that a product caused an allergy to one apparently normal person warranted an inference, as distinguished from a presumption, that it would have had the same effect on a significant number of persons. The record in the *Longo* case, *supra*, shows that there was evidence from which it could have been found that the plaintiff's skin was abnormally sensitive, so that the presumption disappeared, and the direction of a verdict for the defendant was rightly sustained.

*Exceptions sustained.*

*Judgment for the defendant.*