JOHN KALIVAS *vs.* A. J. FELZ CO. & another.[1]

Middlesex. January 12, 1983. — March 16, 1983.

Present: GREANEY, KAPLAN, & DREBEN, JJ.

*Uniform Commercial Code,* Warranty. *Negligence,* Manufacturer, Duty to warn. *Sale,* Warranty. *Practice, Civil,* Directed verdict.

At the trial of an action to recover for injuries sustained by the plaintiff when a drain cleaner containing sulphuric acid leaked from a plastic container he was handling, the judge erred in directing a verdict for the supplier of the drain cleaner where evidence tended to prove that there had been considerable trouble with leaking containers, that the caps of the containers sold to the plaintiff were of the ordinary screw-on type, that at times in the past the containers had caps of apparently superior design, and that although a bulletin issued to salesmen of the supplier warned against leakage and gave instructions on the handling of the containers, no such warnings or instructions appeared on the containers sold to the plaintiff. [486-488]

CIVIL ACTION commenced in the Superior Court on January 6, 1975.

The case was tried before *Steadman, J.*

*Russell H. Mann, Jr.,* for the plaintiff.

*Salvatore F. Stramondo* for the defendants.

KAPLAN, J. The plaintiff, John Kalivas, injured by leakage of a corrosive fluid from a container of drain cleaner sold to him by A. J. Felz Co. (Felz), and sold to Felz by a supplier, Radiator Specialty Co. (Radiator), sued these companies on theories of breach of implied warranty of merchantability (G. L. c. 106, § 2-314) and negligence.[2]

---

[1] Radiator Specialty Co.

[2] Originally the plaintiff's wife was joined as a party, claiming by right of consortium, but that has dropped out of the case, as have claims based on deceit, and a third-party claim by the defendants.

Upon trial, the judge directed a verdict for Radiator at the close of the evidence; the case against Felz went to the jury on special questions which were answered in Felz's favor. On the present appeal the plaintiff challenges the direction for Radiator, as unwarranted on the evidence, and the verdict, as blemished by a misdirection.[3]  We reverse the judgment for Radiator and remand that claim for trial; the judgment for Felz we affirm.

Omitting fine detail, the record shows the following with respect to the plaintiff's case.  On July 17, 1974, the plaintiff, accompanied by his wife, drove to the Felz store in Newton, which offered plumbing materials nominally at wholesale, and asked for something to unplug his bathtub drain.  The salesman sold him two half-gallon, plastic, jug-like containers of "Drain Lax," each enclosed in a plastic bag.  The plaintiff, evidently grasping the handle of each container through the bag, carried the containers to his car and placed these upright on the floor between himself, as driver, and his wife, as passenger.  They arrived home after a six-mile drive through traffic with usual stops and turns. Then the plaintiff, holding one of the containers in his right hand in the manner indicated above, drew it across the seat[4] and, as he opened the door and began to leave the car, drew the container across his body.  He felt a burning sensation.  Dropping the container just outside the car, he ran into the house.  He suffered burns on the lower portions of his body.  This was through escape of the fluid, 93 percent sulphuric acid, from the container and the bag.  Testimony of two witnesses of the accident, and of a claims adjuster who later examined the bag and container, indicated a slow leak from the container, and one of the witnesses observed that the leak was from its neck.

Drain Lax was manufactured for Radiator by Dickler Chemical Labs., Inc., and shipped to Radiator sometmes by Radiator's own trucks.  The containers were packaged four

[3] The denial of Felz's motion for a new trial needs no separate attention.

[4] Leakage onto the seat apparently left a stain there.

to a carton and the cartons were held by Radiator on pallets until shipped to plumbing equipment stores by Radiator trucks or common carriers.

There was evidence of considerable trouble over the years with leaking containers, although the extent and dates of the difficulties were not made quite clear. At times Radiator discovered cartons damaged by leaking containers, in which event it would segregate and discard the offending containers and clean and repack. Less than three months before the plaintiff's accident Radiator found two "leakers" — damaged cartons — in one shipment of Drain Lax. There was testimony that Felz, a long-time customer of Radiator, systematically inspected the cartons when delivered, and individual containers at the time of sales over the counter. Felz found some deteriorated cartons as delivered, and others showing deterioration when warehoused awaiting sales. Some containers showed leakage when withdrawn from the cartons for sale.

Felz complained on numerous occasions about leakage to the salesman of the product who was in communication with Radiator headquarters. Radiator tended to blame the truckers, but it was a permissible inference from the evidence that the troubles did not originate in the course of transportation.

There was evidence that the caps of the containers sold to the plaintiff were of the ordinary screw-on type, and that at times in the past the Drain Lax containers had caps of apparently superior design. Thus a Radiator "Bulletin" to its salesmen dating from the time when Drain Lax was first put on the market (1963) indicated that the cap was then a "locking cap *taped* securely in place" (emphasis in original), "locking" meaning, apparently, a cap that required downward pressure before it could be turned. This cap was said to be "extra insurance against leaks" and was compared with "[c]ompetitive products [that] have caps which loosen and leak." From other sources in the record we learn that at a later time the Drain Lax containers had, in addition to a

cap, a silver foil or aluminum leaf that sealed the neck of the container.

As to warnings about the dangers connected with this sulphuric acid product, the bulletin warned salesmen that "[a]ny product of this nature is dangerous and must not be handled carelessly! . . . Be especially careful about carrying Drain Lax in your car. Make sure the container can't turn over and spill onto the floor or the trunk. We'd be less than candid if we didn't point out the hazards of handling this product . . . you must also point this out to your wholesalers, especially Warehousemen. No product can do what Drain Lax is intended to do *without* being dangerous to handle" (emphasis in original). The warning as to handling the unopened containers, directed to Radiator salesmen, as we have said, was not carried on or about the containers as sold to the ultimate consumers. All that the individual containers did carry was a detailed warning of the dangers involved in the uses of the acid. And as to this warning on the containers, there remains a doubt whether it could be read through such a plastic bag[5] as enclosed each container in the present case. (So much of the warning as indicated that Drain Lax was for sale only to professionals was of course not heeded by Felz in the sale to the plaintiff; and it is some evidence that Radiator knew of more widespread violations by their outlets that it finally abandoned the Drain Lax line in 1977 on just the ground that ultimate sales could not be controlled.)

The plaintiff devoted much time at trial to proof of the injuries, but was less assiduous in tying down liability. Thus he introduced no expert testimony about the merits and costs of the kind of cap actually used on the plaintiff's container in comparison with the caps that could feasibly have been employed. The corpus delicti — the container and bag involved in the accident — had long since disap-

---

[5] It appears that the containers arrived at Felz already enclosed in these bags. There was a suggestion that a container leak might be masked by the bag and made harder to detect.

peared; photographs of the items were received but these were not clearly demonstrative.

1. With regard to the defendant Radiator, we have an example of the unwisdom, except in a plain case, of allowing a motion for a directed verdict when the evidence is in, instead of denying the motion, taking a verdict, and then acting, if need be, on a motion for judgment n.o.v. See *Soares* v. *Lakeville Baseball Camp, Inc.*, 369 Mass. 974, 975 (1976); *Smith* v. *Ariens Co.*, 375 Mass. 620, 627-628 (1978). It is true that the case against Radiator lacked robustness and might well have received the same treatment from the jury as the case against Felz. Yet we think the case was not so thin as to be withheld from the jury.[6]

On the score of warranty in the sense of the adequacy of the design of the article, more particularly the cap, a jury question could perhaps not be made out in the absence of expert testimony going to the mechanical feasibility, costs, and possible consequences of alternative safe designs. See *Back* v. *Wickes Corp.*, 375 Mass. 633, 642 (1978). Cf. *Barker* v. *Lull Engr. Co.*, 20 Cal. 3d 413, 431 (1978). But the question is seen to be a rather close one when we try to interpret and assess against the background of the record the bulletin statement, coming from Radiator itself, that loosening and leaking of the cap could be ameliorated by a taped locking cap. In the face of such an avowal, and considering the notorious dangerousness of the fluid if it should escape, there is some force in the suggestion that a jury might be permitted to infer, without extraneous assistance, that the unguarded cap furnished to the plaintiff was not of proper design. See *Smith* v. *Ariens, supra* at 625; *doCanto* v. *Ametek, Inc.*, 367 Mass. 776, 782 (1975). Cf. *Uloth* v.

---

[6] A directed verdict should be denied if "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Kelly* v. *Railway Exp. Agency,* 315 Mass. 301, 302 (1943).

*City Tank Corp.*, 376 Mass. 874, 881, 884 (1978); *Gynan* v. *Jeep Corp.*, 13 Mass. App. Ct. 504, 508-509 (1982).[7]

We need not, however, press that matter to a conclusion, especially as the evidence on retrial may obviate the doubt one way or the other. The present case does, in our view, present an issue for the jury by reason of the absence of any warning on the container that it was vulnerable to leakage, and the lack of instructions about the proper handling of the container itself in distinction from the use of its contents to do the particular plumbing job. On these matters the bulletin speaks with force. The jury could find with reason, on the record as it stood, that without a warning at least the equivalent in substance of that given to salesmen (more sophisticated, more experienced than ordinary members of the public), the product was defective — not "fit for the ordinary purposes for which such goods are used" (G. L. c. 106, § 2-314 [2][c], inserted by St. 1957, c. 765, § 1). *Wolfe* v. *Ford Motor Co.*, 6 Mass. App. Ct. 346, 350 (1978). *Hanson* v. *Murray*, 190 Cal. App. 2d 617, 623-624 (1961). *Center Chem. Co.* v. *Parzini*, 234 Ga. 868, 869-870 (1975). *Reid* v. *Eckerds Drugs, Inc.*, 40 N.C. App. 476, 482-485 (1979). See *Casagrande* v. *F.W. Woolworth Co.*, 340 Mass. 552, 555 (1960); *Fiorentino* v. *A.E. Staley Mfg. Co.*, 11 Mass. App. Ct. 428, 434 (1981); *Basko* v. *Sterling Drug, Inc.*, 416 F.2d 417, 426-427 (2d Cir. 1969); *Barth* v. *B.F. Goodrich Tire Co.*, 265 Cal. App. 2d 228, 244-245 (1968).[8]

It remains to take a further step. We think the record was sufficient to raise a jury question whether Radiator was negligent in allowing the containers to reach the public without a warning as indicated. Radiator was surely on

[7] See also Annot., Products liability: Modern Cases Determining Whether Product Is Defectively Designed, 96 A.L.R.3d 22 (1979).

[8] Cases bearing on adequacy of warning are found in Annots., Products Liability: Drain Cleaners, 85 A.L.R.3d 727 (1978); Failure to Warn as Basis of Liability Under Doctrine of Strict Liability in Tort, 53 A.L.R.3d 239 (1973); Manufacturer's or seller's duty to give warning regarding product as affecting his liability for product-caused injury, 76 A.L.R.2d 9 (1961).

notice of a propensity of the containers to leak, and a jury might find that it was duty bound to warn that the containers themselves were — as the bulletin said — "dangerous to handle." *Farley* v. *Edward E. Tower Co.*, 271 Mass. 230, 233-234, 237 (1930). *Shaeffer* v. *General Motors Corp.*, 372 Mass. 171, 173-174 (1977). *Fiorentino* v. *A.E. Staley Mfg. Co.*, supra at 433-434. *Rivkin* v. *Monsanto Co.*, 6 Mass. App. Ct. 963 (1978). *Wolfe* v. *Ford Motor Co.*, supra at 349-350 (1978).[9]

2. The trial judge was generous to the defendant Felz in that he did not bar from the jury's consideration those elements of possible fault (e.g., design defect) for which Felz could be only vicariously responsible. It would be hard, in logic, to square this position with the judge's allowance of a directed verdict against the supplier, Radiator. In any event, the jury found for Felz on the whole case, including a rejection of any claim of vicarious liability. As appellant, the plaintiff is reduced to a cavil about the judge's instructions (see note 9, *supra*); other contentions are also without merit.

*Judgment for Radiator reversed.*
*Judgment for Felz affirmed.*

***

[9] In the condition of the record, we do not believe the jury would be entitled to infer solely from the fact of the accident (assuming the exclusion of mishandling by intermediaries) that there was a latent defect in the manufacture of the product. Contrast *Mead* v. *Coca Cola Bottling Co.*, 329 Mass. 440, 441-442 (1952); *Evangelio* v. *Metropolitan Bottling Co., Inc.*, 339 Mass. 177, 180-183 (1959); *MacDonald* v. *Najjar*, 362 Mass. 119, 122 (1972); *Calvanese* v. *W.W. Babcock Co.*, 10 Mass. App. Ct. 726, 732 (1980). The judge was in accord on this point, as he declined a request to charge the Felz jury that such a direct inference was permissible. (However, he charged generally on the meaning and application of inferences.)