INSURANCE COMPANY OF NORTH
AMERICA, Plaintiff, Appellee,

v.

Hassan A. MUSA, Defendant, Appellee.

Appeal of Jamal A. MUSA, D/B/A
Bargain Shop, Defendant,
Appellant.

INSURANCE COMPANY OF NORTH
AMERICA, Plaintiff, Appellant,

v.

Hassan A. MUSA, et al.,
Defendants, Appellees.

Nos. 84–1758, 84–1759.

United States Court of Appeals,
First Circuit.

Argued Nov. 15, 1985.
Decided March 6, 1986.

Harry Anduze Montano, Santurce, P.R., for appellant Jamal A. Musa d/b/a Bargain Shop and appellees Hassan A. Musa, et al.

Charles A. Cordero with whom Cordero, Colon & Miranda, Old San Juan, P.R., was on brief, for Insurance Co. of North America.

Before CAMPBELL, Chief Judge, BREYER and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

This appeal arises out of a civil suit brought by the Insurance Company of North America (INA), in which it claims that defendants Jamal and Hassan Musa deliberately set fire to their store in Ponce, Puerto Rico, in order to collect insurance proceeds. A jury found for the defendants on certain key matters. On this appeal we basically must decide whether the evidence supporting INA was so overwhelming that the district court should have directed a jury verdict or entered judgment notwithstanding the verdict in INA's favor. Having reviewed the record, including exhibits and the transcript of the six-day trial, in light of the governing legal standards, we conclude that the evidence does not allow us to overturn the jury's findings. We therefore accept the district court's similar conclusions and affirm its judgment.

I

The background of this appeal is as follows: INA filed a civil suit in federal district court against the Musas seeking a declaratory judgment that they had committed arson and fraud and that INA therefore owed them nothing under their fire insurance policy with INA. Jamal Musa counterclaimed for the proceeds of the insurance policy; he sought compensation under the policy for 1) damage to the building, 2) loss of business profits, and 3) loss of inventory. The parties stipulated that the first two of these losses amounted to $127,000. They agreed that the Musas would receive this amount, if the jury found the insurance company liable. Jamal claimed that the inventory loss amounted to $1.37 million—a figure that INA strongly disputed.

After trial, the court submitted special interrogatories to the jury. The jury answered them as follows:

1. Do you believe by a preponderance of the evidence that the Bargain Shop fire in Ponce was the result of arson?

Answer: Yes.

2. Do you believe by a preponderance of the evidence that defendant Hassan A. Musa, either directly or indirectly, engaged in a plan with one or more persons so that the fire at Bargain Shop in Ponce could occur?

Answer: No.

3. Do you believe by a preponderance of the evidence that defendant Jamal A. Musa, either directly or indirectly, engaged in a plan with one or more persons so that the fire at Bargain Shop in Ponce could occur?

Answer: No.

4. Do you believe the Insurance Company of North America should be caused to pay any money to defendants under its insurance policy?

Answer: Yes.

5. Do you believe by a preponderance of the evidence the aforesaid claim filed by Jamal A. Musa in the amount of $1,370,000 against the Insurance Company of North America was fraudulent and was intended to deceive the insurance company?

Answer: No.

6. Do you believe defendant Jamal A. Musa proved by a preponderance of the evidence the damages he claims?

Answer: No.

7. If your answer to Queston No. 6 is Yes, then proceed to write the amount of damages you believe he proved at trial. $_____.

Consequently, the district court entered judgment in favor of the Musas for $127,000, the stipulated amount of noninventory damages.

INA appeals on the ground that the district court should have entered judgment n.o.v. in its favor 1) because it proved the Musas were involved in arson, or 2) because it proved they committed fraud in respect to their claim for loss of inventory. Jamal Musa cross-appeals, saying there is an inconsistency between the jury's finding that INA is liable and its refusal to award any damages for lost inventory; he seeks a new trial limited to the amount of inventory damages. We shall consider these issues in turn.

II

█ We turn first to INA's claim that the district court should have directed in its favor a verdict that the Musas committed arson. As INA recognizes, it bears a heavy burden in asking us to insist that the district court reverse the jury's findings on a matter of fact. When we review the denial of a motion for a directed verdict or judgment n.o.v., we view the evidence and draw related factual inferences in the manner most favorable to the verdict winner (here, the Musas). *See, e.g., Borras v. Sea-Land Service, Inc.,* 586 F.2d 881, 885 (1st Cir.1978). In doing so, we must recognize that it is for jurors, not judges, to weigh the evidence and determine the credibility of witnesses. *See, e.g., Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 199 (1st Cir. 1980); *Rios v. Empresas Lineas Maritimas Argentinas,* 575 F.2d 986, 990 (1st Cir.1978). Ultimately, we must uphold the jury's verdict unless the evidence and accompanying inferences "point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at [the] conclusion" actually reached. *Chedd-Angier Production Co. v. Omni Publications International, Ltd.,* 756 F.2d 930, 934 (1st Cir.1985); *see deMars v. Equitable Life Assurance Society of United States,* 610 F.2d 55, 57 (1st Cir.1979). Where the jury's factual conclusion itself takes the form "The plaintiff failed to prove ...," it is particularly difficult for a court to say the jury was wrong; thus, we are especially reluctant to require a directed verdict or the entry of judgment n.o.v. in favor of a party with the burden of persuasion. *See Jordan v. United States Lines, Inc.,* 738 F.2d 48, 49 (1st Cir.1984) (party with burden of persuasion can obtain directed verdict only where he has established his case by "testimony that the jury is not at liberty to disbelieve"); *Mann v. Cannon,* 731 F.2d 54, 55 (1st Cir.1984); *Service Auto Supply Co. v. Harte & Co.,* 533 F.2d 23, 24–25 (1st Cir.1976); *Federal Insurance Co. v. Summers,* 403 F.2d 971, 975–76 (1st Cir.1968); *Roche v. New Hampshire National Bank,* 192 F.2d 203 (1st Cir.1951); 9 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2535, at 591 (1971).

█ INA nonetheless believes it has met these stringent standards. And, we must admit that its evidence, much of it consisting of the Musas' own testimony, is strong. First, the evidence showed a motive to set the fire—namely, money. Jamal Musa, who owned the burned store, testified that he owed $1 million at the time of the fire. His accountant stated that, as of a few months before the fire, Jamal had overdrawn his checking account by $652,000. Jamal owed his brother Hassan $58,000, and he also owed money to his landlord.

Second, INA presented evidence suggesting the defendants had engaged in a 'pattern' or 'practice' of setting fires to collect insurance proceeds. It pointed out that Hassan Musa, after moving to Puerto Rico from Jordan in 1961, opened several different stores called Bargain Shops. He arranged to give, to sell, or to rent various individual Bargain Shops to his brothers and cousins. Over the years, fires occurred at several of these stores. The store belonging to Hassan's cousin Abraham burned, after which Abraham eventually paid off a debt to Hassan of about $60,000; the store belonging to Hassan's cousin Mohammed burned, after which Mohammed paid off a debt to Hassan of about $65,000; and the store belonging to Hassan's brother Hussein burned, after which Hussein paid off a debt to Hassan of about $80,000. Moreover, in 1975, a fire occurred at the store in Rio Piedras owned by Hassan's brother and co-defendant Jamal Musa; Hassan testified that he could not remember whether or not Jamal had owed him money (or paid him) at the time.

Third, INA presented evidence of specific acts by Jamal suggesting an intent to set the fire here in dispute. The fire at Jamal's store in Ponce took place just after midnight on Thanksgiving Day, November 25, 1981. Until April of that year Hassan had carried $800,000 insurance on the store's merchandise. In April Hassan added Jamal as a beneficiary under the policy, and Jamal increased the coverage to $1,450,000. And, according to Jamal's books and his testimony, the Ponce store bought lots of merchandise in 1981, sharply increasing its inventory from about $300,000 at the end of 1980 to nearly $800,000 in mid-1981 to about $1.4 million at the time of the fire. Yet, the store's recorded sales did not increase during this period. Moreover, INA argued these 'purchases' were fictitious. The store's warehouseman testified that the store contained fewer goods than normal in mid-1981 and that it contained "quite less" merchandise at the time of the fire. He said that, aside from a shipment of drapes and bedspreads, he could not recall any other large deliveries in the weeks before the fire, even though Christmas was approaching. Another employee testified that almost all of these drapes and bedspreads had been carried away from the store by Jamal's "fellow countrymen" sometime before the fire. She also said that Jamal appeared "worried" and "in a hurry" the night before the fire.

Fourth, INA presented evidence showing that Jamal had an almost unique opportunity to set (or to arrange the setting of) the fire. Jamal said he had the only known sets of keys. Bystanders did not hear the burglar alarm sound; Jamal, who knew how to turn it off, said he had been the last person to leave the store before the fire occurred. Moreover, a witness saw a car speed off minutes after the fire started, and took down its license number. The car belonged to George Saba, a friend of Hassan and Jamal, who Hassan testified had owed him up to $100,000 at some time in the past. (Saba, too, had once suffered a fire in one of his own stores.)

Fifth, INA produced convincing and uncontroverted evidence of arson. Its expert witness found that someone had poured gasoline (or a similar "accelerant") on the floor of the store before the fire broke out.

Finally, Evaristo Maldonado, a consulting engineer who testified for INA, said that when he inspected the debris several days after the fire, he found hardly any remnants of inventory, such as zippers, buttons, balls of fabric ash, or remains of television sets.

Given the strength of INA's case, the reader may wonder how the jury could have found that INA failed to prove the Musas involved in arson. The answer may lie in the few favorable bits of testimony that the Musas' counsel was able to elicit from INA's witnesses (who included the Musas themselves) and the favorable inferences that might be drawn from that testimony. For one thing, Jamal Musa simply denied having anything to do with the fire. He said he was at home playing dominoes with friends on the night of the fire, and

that the first he heard of it was when the police came by with the news. For another thing, George Saba testified that he did not set the fire. He said that his car had been stolen the night the fire occurred, and that he reported the theft to the police early the next morning. Further, the Musas' counsel pointed to financial records that cast doubt on INA's claims that Jamal was desperate for money. Financial records in evidence state that Jamal had assets worth $2.5 million as of June 30, 1981, and that this figure exceeded his liabilities by $875,-000. Jamal not only reopened his Ponce store after the fire but also opened two new stores, all without the benefit of the insurance proceeds. In addition, as the Musas' counsel pointed out, there was no evidence suggesting arson in respect to any of the four earlier fires. To the contrary, testimony indicated that Jamal's earlier fire in 1975 took place at midday, in a crowded store, when an electrical generator shot out sparks, causing (according to Jamal) $250,-000 in damages, of which he recovered $75,000 in insurance proceeds. INA's failure to show that the Musas were involved in setting the previous fires limited the probative value of the evidence of those fires, *cf. Wernowsky v. Economy Fire & Casualty Co.*, 106 Ill.2d 49, 87 Ill.Dec. 484, 486–87, 477 N.E.2d 231, 233–34 (1985) (deeming similar evidence inadmissible), and may even have prompted the jury to infer that those fires were *not* suspicious in origin. INA's counsel also elicited testimony apparently designed to suggest inadequate police investigation of the fire (perhaps to suggest some kind of improper influence); but, in doing so, he may have given the jury the impression that the police believed the Musas were innocent.

Viewing all of the above in the light most favorable to the Musas, and remembering that the jury was not compelled to credit all the testimony supporting INA, we believe the evidence implicating the Musas was strong, but not so overwhelming as to warrant taking the arson claim from the jury. The key factual question here is not arson—the jury agreed there was arson—but whether INA proved "by a preponderance of the evidence" that either Hassan or Jamal Musa "either directly or indirectly engaged in a plan with one or more persons so that the fire ... could occur." For the jury to have answered 'yes,' it would have had to believe that Hassan, Jamal, and George Saba were all lying—a conclusion we cannot draw as a matter of law.

INA says Saba was not a very believable witness; he claimed, for example, that he could speak very little Spanish, despite having lived in Puerto Rico since 1969, having managed several stores with Puerto Rican employees, and having been married to a Colombian woman for four years. Yet even assuming, purely for argument's sake, that we might be legally justified in disregarding Saba's testimony—on the theory that it was, say, inherently incredible, or that it "flies in the teeth of ... universal experience," *New England Merchants National Bank v. Rosenfield*, 679 F.2d 467, 473 (5th Cir. Unit B 1982), *cert. denied*, 459 U.S. 1173, 103 S.Ct. 819, 74 L.Ed.2d 1017 (1983)—that alone would not warrant judgment n.o.v.; the jury could have disbelieved Saba—concluding that he had set or at least planned the fire—without believing that Jamal or Hassan had put him up to it.

■ We are not free to disregard Jamal's testimony. For one thing, we cannot say, as a matter of law, that his testimony "is in irreconcilable conflict with immutable laws of physics or is wholly inconsistent with established and uncontroverted physical facts." *Kansas City Public Service Co. v. Shephard*, 184 F.2d 945, 947 (10th Cir.1950); *see also Ralston Purina Co. v. Hobson*, 554 F.2d 725, 729 (5th Cir.1977) (affirming directed verdict *against proponent* where his only evidence was "manifestly at variance with the laws of nature and the physical facts"). For another thing, even if we suppose for the sake of argument that a court may properly disregard "unsupported self-serving testimony that flies in the teeth of unimpeachable contradictory evidence and universal experience," *New England Merchants National Bank v. Rosenfield*, 679 F.2d at 473 (affirming directed verdict *against propo-*

*nent* ); *see also Ralston-Purina Co. v. Hobson,* 554 F.2d at 728–29, we do not believe Jamal's testimony fits that description. A juror who credited Jamal's testimony might have concluded that INA, though it had proved highly suspicious circumstances, had not proved Jamal's or Hassan's involvement in setting the fire. Since we cannot say that such a juror's conclusions about credibility or his assumptions about how the world works are those of an unreasonable human being, *cf. United States v. Guerrero-Guerrero,* 776 F.2d 1071, 1075 (1st Cir.1985), we cannot say the district court should have reversed the jury's findings.

We draw support for this conclusion from our inability to find cases in which courts have directed a verdict (or entered judgment n.o.v.) where the question of witness credibility is as significant as it is here. At the same time, we have found numerous cases indicating that a directed verdict would be improper. *See, e.g., Hindman v. City of Paris,* 746 F.2d 1063, 1068 (5th Cir.1984); *Carter v. Duncan-Huggins, Ltd.,* 727 F.2d 1225, 1234 (D.C.Cir.1984); *Allen v. Zurich Insurance Co.,* 667 F.2d 1162, 1165 (4th Cir.1982); *Fireman's Fund Insurance Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1178–80 (3d Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). The cases cited by INA do not support a directed verdict here. They basically suggest that when an insurer produces substantial circumstantial evidence of arson by the insured, the district court should submit the arson claim to the jury. *See, e.g., Cora Pub, Inc. v. Continental Casualty Co.,* 619 F.2d 482, 484–87 (5th Cir.1980); *Don Burton, Inc. v. Aetna Life & Casualty Co.,* 575 F.2d 702, 706–08 (9th Cir.1978); *Elgi Holding, Inc. v. Insurance Co. of North America,* 511 F.2d 957, 959 (2d Cir.1975) (per curiam); *Stein v. Girard Insurance Co.,* 259 F.2d 764, 766 (7th Cir.1958); *see also* 18 R. Anderson, *Couch on Insurance 2d* § 74:669, at 989 (M. Rhodes rev. ed. 1983) ("The existence of a criminal intent on the part of the insured, who is alleged to have burned the insured property, ... [is] peculiarly a ques-

tion for the jury."). That is precisely what the district court did.

Thus, we have little doubt that the district court's conclusion is correct as a matter of existing law. Moreover, the law is less likely to work an injustice than one might think on the basis of the evidence we have described. In part this is so because the law provides an alternative means to remedy whatever injustice may exist in a case like this one. The "aggrieved" party may ask for a new trial—a remedy that affords relief to that party without abrogating his opponent's right to a jury trial. In considering a new trial motion, the court *may* weigh the evidence and assess the credibility of witnesses. *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2806 (1971). And, it can grant a new trial when "the verdict is against the clear weight of the evidence, is based upon evidence that is false, or resulted from some trial error and amounts to a clear miscarriage of justice." *Payton v. Abbott Labs,* 780 F.2d 147, 152 (1st Cir. 1985). If the district court denies the motion, an appellate court can itself order a new trial if the jury's verdict was "so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice." *Valm v. Hercules Fish Products, Inc.,* 701 F.2d 235, 237 (1st Cir.1983) (quoting *Hubbard,* 626 F.2d at 200).

In this case, however, INA did not ask for a new trial in the court below, or in its brief on appeal. When we asked INA's counsel at oral argument whether INA wished a new trial, he responded negatively. Perhaps this is because the trial's results were partly favorable to INA: the jury awarded the Musas none of the $1.37 million they sought for inventory damages, though INA must pay $127,000 because of its stipulation as to other damages. Whatever INA's reasons, it has not sought, and does not seek, a new trial. Thus, we need not consider whether the evidence would have required a new trial had INA asked for one. *See Della Grotta v. Rhode Island,* 781 F.2d 343, 350 n. 9 (1st Cir.1986); *Alderman v. Tandy Corp.,* 720 F.2d 1234

(11th Cir.1983) (although jury findings were inconsistent, appellate court lacked power to order new trial where plaintiff had not sought one below and where judgment n.o.v. standards were not met); *see also Goldsmith v. Diamond Shamrock Corp.,* 767 F.2d 411, 414–15 (8th Cir.1985); *Kain v. Winslow Manufacturing, Inc.,* 736 F.2d 606, 608–09 (10th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1360, 84 L.Ed.2d 381 (1985); *Jackson v. Wilson Trucking Corp.,* 243 F.2d 212 (D.C.Cir. 1957).

In sum, despite the strength of INA's case, the factual questions at issue, dependent for their resolution on witness credibility, brought the matter within the province of the jury. For that reason, we believe the district court properly denied judgment n.o.v. on INA's arson claim.

### III

■ If the law permits the jury in this case to have found that the Musas did not plan arson, so must it permit the other jury findings that the parties here attack. INA also says it was entitled to a directed verdict (or judgment n.o.v.) on the ground that Jamal Musa's claim for $1.37 million in inventory damages was fraudulent. And, again, INA submitted fairly strong evidence on the point. First, INA emphasized Jamal's employees' testimony that the store contained less inventory than usual at the time of the fire, and that Jamal's "fellow countrymen" had carried merchandise out of the store shortly before the fire. Second, Maldonado, the consulting engineer who testified for INA, said that he inspected the debris in the store a few days after the fire and found virtually no traces of inventory in the rubble—hardly any zippers, buttons, wire hangers, television set remains, or the "balling of ashes" typically found when fabric burns. Third, an INA claims accountant, Daniel Grady, said that the records that Jamal Musa supplied him, designed to show the value of the store's inventory, were totally inadequate. Photocopies of many 'purchase' invoices, for example, did not show whether the merchan-

dise had been delivered to Ponce or to some other Bargain Shop store—a serious omission, given that the Musa brothers and their cousins bought at least some of their merchandise together. Different photocopies of the same documents seemed to show different signatures. Since Jamal conceded that he did not keep records of precisely what he sold for cash (and he had many cash sales), there was no way to determine how much of the reported inventory 'purchases' remained in the store on the night of the fire. Nor was there any other list itemizing actual inventory. Grady added that it would be very odd for a firm with declining sales suddenly to build up its inventory from $300,000 to $1.4 million over the course of eleven months.

On the other hand, the jury need not have accepted all this evidence as true or probative; and, it might have accepted contrary testimony. Jamal Musa testified that at the time of the fire his store was "full of merchandise ... because we were just going into Christmas." And, although the inventory records he produced were scrambled, the store's general ledger apparently did show an inventory of more than $1.3 million in November 1981.

In addition, the jury might have placed little weight on Maldonado's testimony about the post-fire debris. Maldonado was an expert on building construction, not on what things look like after they burn; INA had sent him to Ponce chiefly to assess the cost of repairing the building. The jury might have had doubts about how systematically and effectively Maldonado had searched for burned inventory, given his testimony that he did not use a shovel or pick in digging through the rubble (which photographs showed to be dense, several feet high, and partially covered by fragments of the caved-in roof). The jury might also have found Maldonado's testimony overstated in light of the evidence that there was at least some inventory in the store when it burned down. The jury might even have doubted that Maldonado knew what he was looking for at the time of his inspection, since it took place several

months before Jamal told him where various kinds of merchandise had been located within the store.

Furthermore, the jury, while accepting the testimony of the accountant Grady, might have noted his caution in respect to fraud or "intent to deceive." Grady stated his conclusions about the state of Musas' records as follows:

> I have a lot of reservations about them. There are things that I seen in there that puzzles me, that I can't tie together with other records. I can't reconcile some records with others and I should be able to. I can't get all the numbers to fit in the proper pattern and I should be able to. I'm concerned about the enormous build up in value of inventory for no apparent reason. All of these things go into my judgment, whether or not there is sufficient evidence of receipt at the store; whether or not I believe that I have an accurate accounting of sales; whether all the deposits are in fact made; whether all sales are in fact recorded. All of these things are questionable in this case in my judgment.

Finally, the jury may have taken Jamal's efforts to supply INA with the records it sought as showing a lack of intent to deceive.

For reasons similar to those set forth in Part II, *supra,* we conclude that the evidence of fraud was not so overwhelming as to require judgment n.o.v. in INA's favor. The jury might have concluded, for example, that Jamal's overvaluation of inventory stemmed from negligence, not intentional deceit. *Cf. J & H Auto Trim Co. v. Bellefonte Insurance Co.,* 677 F.2d 1365, 1372–73 (11th Cir.1982) ("[I]t was reasonable for the jury to conclude that, although [the insured] may have overvalued the property, no purposeful, wilful misrepresentations were made."). More precisely, it may have concluded that INA *failed to prove* intentional deceit by a "preponderance of the evidence"—the standard of proof followed below, in accordance with the case law cited by INA. *See Garcia Lopez v. Mendez Garcia,* 102 P.R.R. 481, 484 (1974).

We note again that INA did not ask for a new trial; and we hold that the district court properly denied INA's motions for directed verdict and judgment n.o.v.

## IV

In his cross-appeal, Jamal Musa seeks a new trial limited to the issue of damages for loss of inventory. He claims he is entitled to a new trial because the jury's finding that his inventory claim was not fraudulent was inconsistent with its finding that he is entitled to no damages for loss of inventory. The short and conclusive answer to this claim is that there is no such inconsistency.

 When faced with an 'inconsistency' argument, we must uphold a judgment entered on the basis of a jury's special verdicts "if there is a view of the evidence that makes the jury's answers to the interrogatories consistent." *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 590 (1st Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979); *see also Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."); *O'Brien v. Papa Gino's of America, Inc.,* 780 F.2d 1067, 1071 (1st Cir.1986) ("The court must attempt to harmonize the jury's answers if it is possible to do so under a fair reading of them."). And here there is such a view. The two relevant questions and answers were the following:

> 5. Do you believe by a preponderance of the evidence the aforesaid claim filed by Jamal A. Musa in the amount of $1,370,000 against the Insurance Company of North America was fraudulent and was intended to deceive the insurance company?
>
> Answer: No.
>
> 6. Do you believe that defendant Jamal A. Musa proved by a preponderance of the evidence the damages he claims?
>
> Answer: No.

The jury, as previously mentioned, could have answered question 5 "no" because it believed INA had not proved an "intent to deceive." At the same time, it could have answered question 6 "no" because it believed Jamal had not proved any specific amount of inventory damages. As far as Jamal's inventory and other records are concerned, the jury might have accepted testimony such as the following from Mr. Grady, the accountant:

> Question: [I]s there any way that you can verify the cost of those inventory sheets that were shown to you, and produced by Mr. Musa in this case?
>
> Answer: No, sir.
>
> Question: Could you tell us why, on what you base your opinion?
>
> Answer: I might—I base my opinion on that the inventories, as listed, are not specific enough to enable anyone to be able to identify the items as to style, as to serial number, as to model number, none of that appears. They merely say things like dresses, and pants, and shirts, guayaberas, and socks, et cetera; quantities and values.
>
> There is no way that I would be able to determine the actual cost of that inventory without knowing specifically where the goods came from, what style they were, what model they were, what serial number was a television set, which can cost anywhere from fifty dollars to five hundred dollars. And if it merely says television set, there is no way I can ascertain its value.

The jury might also have concluded it lacked solid evidence on the value of the store's inventory in light of testimony that Jamal often sold goods for cash but had no records of what was taken away. While believing that the store contained some goods, the jury could have concluded that Jamal had not provided a rational basis for valuing those goods, and hence had not proved any specific amount of damages. *See Agramonte v. Porto Rican & American Insurance Co.*, 96 P.R.R. 328, 331–32 (1968) (plaintiff failed to carry burden of proving amount of fire loss); *Sanchez v.*

*Cooperativa Azucarera "Los Canos"*, 66 P.R.R. 330, 336–37 (1946) ("The mere fact that plaintiff may have sustained losses does not entitle her to compensation, for in order to obtain it, she must furnish the court with the basis for determining the amount thereof.").

For the reasons stated, the judgment of the district court is

*Affirmed.*