Davy **VENTURELLI**, Plaintiff, Appellee,

v.

**CINCINNATI, INCORPORATED,**
Defendant, Appellant.

No. 87–1609.

United States Court of Appeals,
First Circuit.

Heard March 11, 1988.

Decided June 29, 1988.

Rehearing En Banc Denied Aug. 5, 1988.

Thomas D. Burns with whom Christopher A. Duggan and Burns & Levinson, Boston, Mass., were on brief, for defendant, appellant.

William J. Griset, Jr., with whom Arthur P. Skarmeas, and Latti Associates, Boston, Mass., were on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, COFFIN and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The plaintiff in this diversity case, Davy Venturelli, crushed the tip of his left index finger in a "plate-shearing" machine, a machine that cuts strips from large metal plates. He sued the machine's manufacturer, Cincinnati, Inc., claiming that Cincinnati designed the machine negligently and (in 1947) sold the "defective" machine in breach of its warranty of merchantability. The jury rejected Venturelli's negligence claim, but accepted his breach of warranty claim. It awarded him $85,000. Cincinnati appeals from this judgment, basically argu-ing that the evidence does not support the verdict. We affirm the district court.

I

To understand this appeal, one must first understand how the shearing machine works. The machine cuts sheets of metal, usually steel plates up to ½–inch thick (but it can cut other metals of other thicknesses, such as 1–inch thick brass or copper plates). In relevant part, the machine consists of a waist-high cutting platform about 10 feet wide along which the operator pushes the metal plate. At the far end there are blades running the width of the machine. A set of 11 "hold-down" metal cylinders approximately 3 inches in diameter, called "dogs," also runs the width of the machine just in front of the blades, and just in front of the "dogs" there is a kind of metal curtain consisting of 11 "tear-drops," each 2 inches wide. As the operator pushes the steel sheet along the cutting board, the far end of the sheet enters the space (at least 1 1/16–inch wide) between the bottom of the metal "tear-drop" curtain and the top of the cutting board. The sheet passes under the metal "dogs" and in between the blades, coming to rest against the back barrier, which can be adjusted, depending upon the size of the metal piece one wishes to cut. The operator pushes a foot pedal, the 11 "dogs" descend, clamping the steel sheet firmly to the cutting board, and the blades, something like a giant scissors, cut the metal sheet. After removing the back piece of cut metal, the operator can then push the remaining steel plate further into the machine, ready to take the next slice. We have drawn our own rough diagrams to help make clear how we understand the machine to work. *See* Appendices A, B, *infra.*

The accident in question took place on October 13, 1981. Venturelli, while pushing a sheet of metal into the gap, put his finger under one of the "dogs." He failed to remove it. He pushed the foot pedal. The "dogs" descended and crushed his finger.

The trial, in large part, consisted of a disagreement among experts about whether Cincinnati made the machine sufficiently safe. Plaintiff's expert said that Cincinnati could, and should, have added such safety devices as (1) an adjustable barrier that would have kept the operator's hands out of the dangerous clamping/cutting "point of operation" area, (2) warning signs or different colored paint which would have alerted the operator more explicitly when he was in danger, or (3) other devices such as "wristlets" that would have physically restrained the operator's hands. Defendant's experts said that Cincinnati had done all that one could have reasonably expected a manufacturer to do, at least in 1947, the date of the machine's manufacture.

The district court asked the jury to provide its verdict in the form of answers to special questions. The questions and answers were as follows:

1. Was defendant's design improper in that there was a likelihood that an experienced worker would be injured?

Answer: Yes

2. Did defendant, as of 1947, fail to exercise reasonable care in attempting reasonably to avoid dangers and anticipate foreseeable risks?

Answer: No

3. Did plaintiff, knowing of a danger, use the machine in a way he knew to be unreasonable?

Answer: No

4. If you answer question No. 3 No, Did plaintiff fail to exercise the degree of care that should be expected of a prudent experienced worker?

Answer: Yes

5. Was plaintiff's injury due, in whole or in part, to lack of adequate indication of the danger by the defendant?

Answer: Yes

6. If, in your answers to the above questions you have found fault by both parties, (Yes to No. 2 and/or No. 5, means fault by defendant. Yes to No. 3 and/or No. 4, means fault by plaintiff), state the proportions of fault.

   Plaintiff  50%
   Defendant  <u>50%</u>
            100%

7. Did defendant take reasonably sufficient steps in attempting to persuade General Ship [plaintiff's employer] to bring the machines safety equipment up to current requirements?

Answer: No

8. If you answer questions No. 1, 2 and 5, or any of them, Yes, What were plaintiff's damages?

Answer: $85,000

The court and parties treated Question 1 as encompassing the issue of warranty liability and Question 2, negligence liability. Since the jury answered Question 2 "no," and since "contributory" or "comparative" negligence does not affect "warranty liability" damages in Massachusetts, *Correia v. Firestone Tire & Rubber Co.*, 388 Mass. 342, 353–57, 446 N.E.2d 1033 (1983), the court awarded Venturelli $85,000. The defendant now appeals.

## II

We shall deal with each of Cincinnati's claims on this appeal in turn.

■ 1. Appellant first argues that, given the evidence, a reasonable juror could not find a breach of the seller's warranty of merchantability under Massachusetts law. The Massachusetts Supreme Judicial Court has stated the basic standard, which we quote in full:

A warranty of merchantability that goods "are fit for the ordinary purposes for which such goods are used" is implied in a contract for their sale. G.L. c. 106, § 2–314(2)(c) (1984 ed.). The implied warranty of fitness includes uses which are reasonably foreseeable but does not include unforeseeable misuses of a product. *Back v. Wickes Corp., supra*, 375 Mass. [633] at 640, 378 N.E.2d 964 [1978]. "[A] manufacturer must anticipate the environment in which its product will be used, and it must design against the reasonably foreseeable risks attending the product's use in that setting." *Id.* at 640–41, 378 N.E.2d 964. Thus, to prove his case a plaintiff asserting a personal injury claim based on a

breach of an implied warranty of merchantability must prove that at the time of his injury he was using the product in a manner that the defendant seller, manufacturer, or distributor reasonably could have foreseen. See *Correia v. Firestone Tire & Rubber Co., supra,* 388 Mass. at 357 n. 15, 446 N.E.2d 1033. *Allen v. Chance Manufacturing Co., Inc.,* 398 Mass. 32, 33–34, 494 N.E.2d 1324 (1986). Although the matter was strongly contested, we believe a reasonable juror could have found that the plaintiff met this burden of proof. The plaintiff (as the jury found) negligently placed his finger under the "dog." But one might believe that workmen are frequently careless and that a manufacturer should design its machine with that fact in mind. *Id.* (citing *Back v. Wickes Corp.,* 375 Mass. 633, 640–41, 378 N.E.2d 964 (1978)); *DeMedeiros v. Koehring Co.,* 709 F.2d 734, 738–39 (1st Cir.1983) (under Massachusetts law, worker's "instinctive reactions, momentary inadvertence, or forgetfulness" are part of environment manufacturer must anticipate in the design of industrial machinery); *see also Uloth v. City Tank Corp.,* 376 Mass. 874, 384 N.E.2d 1188 (1978). The defendant pointed out that few, if any, similar machines in 1947 had barriers to keep out fingers, painted "danger areas" in different colors to provide a visual warning, or the like; hence, it says, the Cincinnati plate-shear, which lacked these safety devices, was "merchantable." But plaintiff's expert, using memory and technical books, claimed that better barriers were then technologically and economically feasible, and that a barrier, perhaps leaving a ⅝–inch rather than a 1¹⁄₁₆–inch gap (but adjustable upwards to permit cutting, say, 1–inch brass or a ½–inch "wavy" steel plate) could have better kept out fingers.

Appellant adds that, even if plaintiff met the burden imposed by *present* law, the law in 1947 was different; and, plaintiff failed to meet the burdens imposed by the law *then.* The language of the law, however, has not changed radically since 1958. *Compare Allen,* 398 Mass. at 33–34, 494 N.E.2d 1324, *with McCabe v. Liggett Drug Co., Inc.,* 330 Mass. 177, 181, 112

N.E.2d 254 (1953) ("If the coffee maker was so imperfect in design that it could not be used without the likelihood of an explosion it could be found that the appliance was not reasonably fit for making coffee and therefore not merchantable.") (citations omitted). And, even though the way courts apply that language to the facts may have changed, courts typically apply newer understandings of "old" legal standards to "old" sets of facts. That is to say, they normally treat law as "found," not "made." *E.g., Simpson v. Union Oil Co.,* 396 U.S. 13, 14, 90 S.Ct. 30, 31, 24 L.Ed.2d 13 (1969) (per curiam) ("Formulation of a rule of law in an Article III case or controversy which is prospective as to the parties involved in the immediate litigation would be most unusual, especially where the rule announced was not innovative."); *City of Chelsea v. Richard T. Green Co.,* 318 Mass. 85, 87, 60 N.E.2d 351 (1945) ("The *Barry* case [re-interpreting tax code] did not change the law. It merely decided what had been the law all of the time, even during the period when the *Cable* case [precedent overruled by *Barry* ] was thought to state the law.") (citations omitted). *See generally* Levy, *Realist Jurisprudence and Prospective Overruling,* 109 U.Pa.L.Rev. 1, 2–6 (1960), and authorities cited therein. The risk in failing to do so (that is to say, the risk in applying *all* legal change only prospectively) is that of proliferating fine-spun, temporally based differences in the application of similar-sounding standards—the risk, in other words, of making the law too difficult to apply. Of course, in some circumstances a change in the meaning of legal terms can create unfairness by disrupting prior expectations (a fact that makes courts hesitate to change the law too quickly). *E.g., Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) (state supreme court giving retroactive application to criminal statute denies defendants of right to fair warning of criminal prohibition and thus violates Due Process Clause of the Fourteenth Amendment). And, where such circumstances are important—where change is sudden, or great—a court

may explicitly act to take them into account, say, by overruling a prior precedent prospectively only, *see Great Northern Railway Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364–65, 53 S.Ct. 145, 148–49, 77 L.Ed. 360 (1932), and cases cited therein. But, such "prospective-only" application is the exception, not the rule.

The Massachusetts courts have not suggested, in any cases expanding the application of the "breach of warranty" language here at issue, that the expansion applies "prospectively only." Appellant argues, however, that the newer caselaw does not apply because Massachusetts warranty law now (after 1958) interprets the Uniform Commercial Code ("UCC"), but the law *in 1947* interpreted a *different statute*, the Uniform Sales Act. That fact, in appellant's view, means the Massachusetts courts would not apply a newer, stricter interpretation of the UCC to cases involving goods sold pre–1958, while the Sales Act was still in effect.

We do not agree for three reasons. First, the relevant language of the Uniform Sales Act and the UCC is almost identical. The UCC, interpreted in *Allen*, states that goods must be "fit for the ordinary purposes for which goods are used," Mass. Gen.Laws ch. 106 § 2–314(2)(c) (1986) and the statute explicitly refers to that warranty as one of "merchantability." The Uniform Sales Act referred to "an implied warranty that" the goods "shall be of merchantable quality," G.L. (Ter. ed.) ch. 106, § 17(2) (1909), *repealed by* 1957 Mass.Acts ch. 765, § 1 (effective October 1, 1958), and Massachusetts courts consistently defined the words "merchantable quality" to mean that the goods were "reasonably suitable for the ordinary purposes for which goods of that description are sold," *Taylor v. Jacobson*, 336 Mass. 709, 716, 147 N.E.2d 770 (1958). Indeed, cases defining the common-law warranty of merchantability, predating the 1909 Uniform Sales Act, also use similar language. *E.g., Leavitt v. Fiberloid Co.*, 196 Mass. 440, 452, 82 N.E. 682 (1907) ("If, however, [the goods which in this case did burst into flame but, as ordinarily manufactured, would not have,] then there is a breach of the implied warranty of the vendor, when he is the manufacturer, that the goods are merchantable or fit for the ordinary uses to which goods of that name are put.").

Second, the cases applying the Uniform Sales Act in Massachusetts do not foreclose a finding of liability here. Plaintiff cites *Vincent v. Nicholas E. Tsiknas Co., Inc.*, 337 Mass. 726, 151 N.E.2d 263 (1958) (appellate court properly reversed auditor's finding of liability when plaintiff was injured applying beer bottle opener to baby food jar; instructions said "pry up gently at points indicated"); *Casagrande v. F.W. Woolworth, Co., Inc.*, 340 Mass. 552, 165 N.E.2d 109 (1960) (court reversed jury verdict for plaintiff harmed because of allergic reaction to deodorant); and *Taylor, supra,* (court upheld directed verdict in favor of manufacturer of hair dye because plaintiff failed to take prescribed warning test before using dye and suffering allergic reaction). Although these cases (particularly *Vincent*) offer appellant support, they are not absolutely inconsistent with this case. That is to say, one could believe the misuses of the products in *Vincent, Casagrande,* and *Taylor* were not "reasonably foreseeable" but yet also believe that the misuse here was foreseeable. *See Allen*, 398 Mass. at 33–34, 494 N.E.2d 1324. The shift in judicial attitude is not overwhelming.

Third, although Massachusetts recognizes some differences between the Sales Act and the post–1973 enactment of the UCC (*see Swartz v. General Motors Corp.*, 375 Mass. 628, 378 N.E.2d 61 (1978) (pre–1973 UCC requirement of privity exists in respect to pre–1973 facts)), we can find no indication in the caselaw that a Massachusetts court would treat these two similarly worded liability standards differently. We conclude that the jury could properly find the plaintiff met his burden of showing an "ordinary" use.

■ **2.** The appellant next argues that Venturelli misused the product and that, therefore, he cannot recover. Indeed, the jury found that Venturelli, by placing his hand in a dangerous part of the machine, was 50 percent negligent. But, in Massa-

chusetts, unlike many other states, the courts do not reduce a "breach of warranty" verdict to reflect comparative fault. *Compare Correia,* 388 Mass. at 353–57, 446 N.E.2d 1033, *with, e.g., Daly v. General Motors Corp.,* 20 Cal.3d 725, 575 P.2d 1162, 144 Cal.Rptr. 380 (1978) (comparative negligence fully applicable in products liability actions based on theory of strict liability) *and Zahrte v. Sturm Ruger & Co., Inc.,* 709 F.2d 26, 28 (9th Cir.) (under Montana law, plaintiff's assumption of the risk proportionately reduces manufacturer's products liability in same way as does comparative negligence) (citation omitted), *cert. denied,* 464 U.S. 961, 104 S.Ct. 395, 78 L.Ed.2d 338 (1983); *see generally* Annotation, *Applicability of Comparative Negligence Doctrine to Actions Based on Strict Liability in Tort,* 9 A.L.R. 4th 633 (1981). Rather, once the plaintiff shows that his was a "reasonably foreseeable" accident, he will recover full damages unless defendant proves that plaintiff voluntarily and unreasonably encountered a known danger, in which case (in Massachusetts) he will recover nothing.

The Supreme Judicial Court explained the matter in *Allen* as follows:

> Quite apart from this element of a plaintiff's claim [foreseeability of use] is a defendant's affirmative defense that the plaintiff is barred from recovery because (1) he violated a duty to act reasonably with respect to a product he knew to be defective and dangerous and (2) that conduct was a cause of the injury.... A defendant making such a claim must prove that the plaintiff knew of the product's defect and its danger, that he proceeded voluntarily and unreasonably to use the product and that, as a result, he was injured. [*Correia v. Firestone Tire & Rubber Co.,* 388 Mass. 342, 355–57, 446 N.E.2d 1033 (1983).] Restatement (Second) of Torts § 402A, comment n (1965). This defense differs from the traditional doctrine of assumption of the risk because it combines a subjective element, the plaintiff's actual knowledge and appreciation of the risk, with an objective standard, the reasonableness of his conduct in the face of that risk. See

> *Zahrte v. Sturm, Ruger & Co.* [203 Mont. 90], 661 P.2d 17, 18–19 (Mont. 1983); *Johnson v. Clark Equip. Co.,* 274 Or. 403, 410 n. 5, 547 P.2d 132 (1976). See also Keeton, Assumption of Products Risks, 19 Sw.L.J. 61, 67–69 (1965). Compare Restatement (Second) of Torts § 402A, comment n (plaintiff "proceeds unreasonably to make use of the product") with *id.* §§ 496C, 496E (plaintiff need only encounter known risk voluntarily). This defense is significant, of course, only when there has been a foreseeable use of the defendant's product which, with other elements, establishes liability for breach of warranty.

398 Mass. at 34–35, 494 N.E.2d 1324 (footnote and citation omitted). Appellant, in essence, argues that Venturelli so clearly failed this test (*i.e.,* Cincinnati so clearly met its burden) that the district court should have directed a verdict in Cincinnati's favor.

The issue is a close one. Venturelli admitted that he knew precisely what was wrong with the machine, that it had no warning signs or barriers, and that those facts made the machine dangerous. He testified that he "was aware that if I put my hand under the dog area it might cause an injury," and that "if I hit the pedal and I inserted my hand the dog would come down." He also used the machine unreasonably, as the jury found in answering Question 4. But, in our view, the *Allen* opinion's "subjective" element refers not simply to the plaintiff's general knowledge of the danger, but to his awareness that he is voluntarily encountering the danger *on the occasion in question.* The defendant has to prove that Venturelli *"voluntarily"* put his hand in the "dog area." *See Zahrte v. Sturm, Ruger & Co.,* 203 Mont. 90, 91–92, 661 P.2d 17, 18–19 (1983) ("[p]laintiff must have a subjective knowledge of the danger and then voluntarily and unreasonably expose himself to that danger before assumption of risk will become operative in strict liability case"). If Venturelli thought his hand was outside the "danger area" but he unintentionally let his hand slip within it, he "unreason-

ably" but "unknowingly" ran the risk, and, in this context, a jury might conclude that he did not "voluntarily" put his hand in the danger zone. *See Elder v. Crawley Book Machinery Company,* 441 F.2d 771, 771–72 (3d Cir.1971) (where plaintiff won jury verdict against manufacturer of book pressing machine for injury to fingers caused when plaintiff inadvertently placed her hand in dangerous part of machine, trial court's definition of "voluntary" conduct as "done by design or intention, intentional, proposed, intended or not accidental" is proper for jury charge on assumption of risk defense). Exactly where Venturelli thought he had placed his hand just before the accident is a matter for the jury. If Venturelli thought his hand was outside the "danger area" (*i.e.,* in front of the teardrops), the jury could have found that Cincinnati did not make out *Allen*'s affirmative defense, in light of *Allen*'s explanation of that defense as we understand it.

The record suggests that Cincinnati presented to the jury at trial a chalk drawing of where Venturelli thought he had his hand. But the chalk is not in the record on appeal. Given appellant's responsibility to create that record and its burden of proof on this issue, we have no reason to think that Venturelli conceded that his hand was in the danger area. And, we must assume that the district court, in denying the motion for a directed verdict, concluded that the jury could have found that the hand was not.

We add that here, too, appellant argues that Massachusetts's legal standards in this area have changed since 1947. But, for reasons pointed out in Section 1 above, this fact, if true, does not make a legal difference.

■ 3. Appellant objects to the district court's failure to direct a verdict in respect to Question 5:

> 5. Was plaintiff's injury due, in whole or in part, to lack of adequate indication of danger by the defendant?
>
> Answer: Yes

It points to cases making clear that a manufacturer need not warn against a "patent and obvious" danger. *Plante v. Hobart Corporation,* 771 F.2d 617 (1st Cir.1985) (interpreting Maine law); *Maldonado v. Thomson National Press Co.,* 16 Mass. App. 911, 449 N.E.2d 1229 (1983) (rescript opinion). Even if a product's dangers are so "patent and obvious" that the manufacturer has no "duty to warn" of them, however, the manufacturer may still be liable because "there is an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery." *Uloth,* 376 Mass. at 881, 384 N.E.2d 1188 (citations omitted). In this case, the jury could have found that Cincinnati could feasibly have installed an adjustable barrier to remove the "patent and obvious" danger of the "dog area." Question 1 presented this alternative theory to the jury, and the jury answered Question 1 in the affirmative.

The defendant did not object to the wording of Question 1, nor to the instructions that permitted the jury to answer it affirmatively through a finding of defective design. Nor did appellant object to Question 8, which reads:

> 8. If you answer questions No. 1, 2 and 5, or any of them, Yes, What were plaintiff's damages?
>
> Answer: $85,000

Since the simple deletion of Question 5 (which is what appellant requested) would not have affected the answers to Questions 1 and 8 without changes in the instructions (which the defendant did not request with respect to this issue), the deletion of Question 5 (in light of our upholding of the verdict on a theory of "defective design") would not have affected the verdict. *Cf. Rimer v. Rockwell International Corp.,* 739 F.2d 1125, 1130 (6th Cir.1984) (under Ohio's "two-issue" rule, jury verdict based on two possible theories is affirmed, at trial, if plaintiff is allowed judgment upon proving either one of the two theories and jury verdict on one theory is validated on appeal). Consequently, we need not consider how this case may or may not differ from *Plante* or *Maldonado.*

■ 4. Appellant argues that the court should not have permitted Venturelli's expert, Paul Pritzker, to testify about the

proper design of a shear because Pritzker had no experience with shears or heavy machinery. Pritzker, however, had considerable knowledge of safety engineering. He had been a registered safety engineer for over twenty years; he had written extensively in the field; he had, from July 1985 to July 1986, been President of the National Society of Professional Engineers. He based his opinion not just on a single memory of a machine (with a barrier) he had seen some forty years ago, but also upon texts concerning safety engineering. The decision of whether an expert is adequately qualified is a matter primarily for the district court. Under the circumstances, we cannot say that the district court, in permitting Pritzker to testify, acted outside its lawful powers. *Computer Systems Engineering, Inc. v. Qantel Corp.*, 740 P.2d 59 (1st Cir.1984).

■ 5. Appellant says the district court should have granted it a new trial, in particular because Venturelli (in its view) committed perjury. To support this claim, appellant points to contradictions in Venturelli's testimony that (with one exception) are not very significant. The exception concerns what Venturelli was doing at the time of the accident. In his deposition, Venturelli said:

Q. Were you cutting the last piece on that piece?

A. I completed that cycle of cutting the pieces on that shear, approximately four by four. The process came where we had to cut the pieces in half on a, I should say, a triangle-shaped piece and the accident occurred.

Q. You were cutting a four-inch piece by four-inch piece into a triangle?

A. Approximately that size.

Q. Is it fair to say that the four-inch by four-inch piece was put into the machine at an offset way in order to get a triangle?

A. Sure.

At the trial, however, Venturelli testified as follows:

Q. When you ended up with what, six to eight inches of these four foot long strips of stainless steel?

A. Yes.

. . . . .

Q. What did you do next?

A. Shear them the opposite way.

. . . . .

Q. And what were you trying to do?

A. We were trying to make up pieces to cut to size.

. . . . .

Q. Approximately what size were the rectangular pieces you were making in that type of operation?

A. The rectangular pieces were approximately six by eight inches or six by six inches.

Q. So they might have been square?

A. Yes.

. . . . .

Q. So you were making squares when you got hurt?

A. Yes, I was.

This difference is important, for, if Venturelli had been cutting the metal sheet into small triangles, it is virtually certain that he would have known that he had his hand in the danger area behind the "tear-drops." And, for reasons mentioned in Section 2, that fact would likely warrant a directed verdict for the defendant. If Venturelli were cutting rectangles or squares, he might well have had his hand *outside* the danger area, having later *inadvertently* slipped it beneath and behind the "tear-drop" curtain.

The contradiction disturbed the district court, but it noted that Venturelli explained the contradiction by saying he previously was mistaken. At trial on cross-examination, Venturelli read to the jury his prior deposition statement that he was cutting triangles, not squares. He then testified as follows:

Q. Is that prior testimony under oath in October?

A. Yes, it is.

Q. Is that true?

A. No, it is not true. That is not what I meant. It's different the way you are reading it.

[Venturelli reads more deposition testimony in which he said he was cutting triangles, not squares.]

Q. Well, when did you believe that that testimony was incorrect?

A. Right now I am telling you that that testimony is incorrect.

Q. Well, what was the reason you testified this under oath on October of 1982?

A. It seems to me that I may have been mistaken or I misunderstood the question that was being asked.

His explanation left it to the jury to decide whether, or when, he was accurately stating the facts.

Despite Venturelli's conflicting accounts, and a case that the district court described as "very thin," the court did not grant a new trial. It would not say "the verdict is against the clear weight of the evidence, is based upon evidence that is false, or resulted from some trial error and amounts to a clear miscarriage of justice." *Payton v. Abbott Labs*, 780 F.2d 147, 152 (1st Cir. 1985) (citations omitted). On appeal we can order a new trial only if Venturelli's testimony was "unsupported self-serving testimony that flies in the teeth of unimpeachable contradicting evidence and universal experience." *Insurance Co. of North America v. Musa*, 785 F.2d 370, 374–75 (1st Cir.1986) (citations omitted). We, who have not seen the witnesses, nor been present at the trial, cannot say that the jury's conclusions about credibility are plainly wrong, or that there has been a "clear miscarriage of justice." As in *Musa*, 785 F.2d at 374–75, we must recognize that these matters are for the jury in the first instance, and the district judge in the second. We cannot find their deliberations so lacking in evidentiary support as to warrant reversal.

6. Appellant did not raise its remaining arguments in the district court, *see United Union of Roofers, Waterproofers and Allied Workers, Union No. 33 v. Meese*, 823 F.2d 652, 659 (1st Cir.1987) (citing *Johnston v. Holiday Inns*, 595 F.2d 890, 894 (1st Cir.1979)), or they are without merit.

The judgment of the district court is

*Affirmed.*

834

Front View of "Plate Shear"

Key

A.   Foot Pedal

B.   Cutting Platform

C.   "Tear-Drop" Awareness Barriers

D.   Gap Into Which Metal Plate Is Fed

APPENDIX B

SIDE VIEW OF "PLATE SHEAR"

KEY

A. TOP OF CUTTING PLATFORM

B. "TEAR-DROP" AWARENESS BARRIER

C. GAP (1-¼₆") INTO WHICH METAL PLATE IS FED.

D. CYLINDRICAL "HOLD-DOWN" OR "DOG," 3" DIAMETER

E. CUTTING BLADE AREA

F. ADJUSTABLE BACK BARRIER